**Bobby Lee KINCADE, et al.**

v.

**The FIRESTONE TIRE & RUBBER CO.**

No. 75–187–NA–CV.

United States District Court, M.D. Tennessee, Nashville Division.

Nov. 25, 1987.

Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, Barry Goldstein, New York City, David A. Copus, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., for plaintiffs.

Daniel Karnes, Firestone Tire & Rubber Co., Akron, Ohio, William N. Ozier, Bass, Berry & Sims, Nashville, Tenn., for defendant.

## MEMORANDUM

JOHN T. NIXON, District Judge.

This is an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.*, and 42 U.S.C. § 1981. At the time the complaint in this matter was filed, the original named plaintiffs fell into the following categories. Plaintiffs Joseph Johnson, Bobby W. Ivy, Emily Henry, and Alice Gail Cook were unsuccessful black applicants for employment at defendant Firestone Tire and Rubber Company's ("Firestone") LaVergne, Tennessee, manufacturing plant. Plaintiffs James O'Dell Hunter and Mary Louise Pope (Fite) were current black employees at the plant. Plaintiffs Bobby Lee Kincade, Thelma M. McHenry and Sharon McHenry were former black employees at the plant. In addition, in an Order entered May 17, 1986, this Court, through the Honorable L. Clure Morton, Chief District Judge, certified the plaintiffs as representatives of a class comprised of the following three subclasses:

(1) black employees at the defendant's LaVergne plant who allegedly were discriminated against because of race in promotion and working conditions;

(2) black applicants of defendant LaVergne plant who allegedly were denied employment because of race; and

(3) black persons who allegedly were discharged because of race by defendant at its LaVergne plant.

Also named as a plaintiff was the Nashville Branch of the National Association for the Advancement of Colored People ("NAACP").

The nonjury trial of this case was held intermittently beginning on June 23, 1980 and ending on February 28, 1983. This Memorandum constitutes the Court's findings of fact and conclusions of law.

The Court first considers plaintiffs' claims of class-wide racial discrimination. It then considers individual claims of discrimination by the individual named plaintiffs in this action.

## I. CLASS CLAIMS

The Court now considers plaintiffs' claims of class discrimination. In support of these claims, plaintiffs rely upon testimony of members of the class and a statistical analysis of the relationship between race and Firestone's employment practices.

The Court examines Firestone's employment practices in three separate categories: (1) recruitment, hiring and initial assignments; (2) promotions; and (3) disciplinary actions and discharge practices. For each category, the Court begins by making findings of fact, including a review of the statistical evidence presented by both parties. It then makes conclusions of law with respect to class claims pertaining to each category. Thus, the Court's discussion of plaintiffs' class claims proceeds as follows:

A. Applicable Law
 1. Disparate Treatment
 2. Disparate Impact
B. Use of Statistical Evidence
C. Recruitment, Hiring, and Initial Assignments
 1. Findings of Fact
 a. Non-statistical Findings
 b. Statistical Proof
 2. Conclusions of Law
 a. Disparate Treatment
 b. Disparate Impact
D. Promotions
 1. Findings of Fact
 a. Non-statistical Findings
 b. Statistical Proof
 2. Conclusions of Law
 a. Disparate Treatment
 b. Disparate Impact
E. Disciplinary Actions and Termination Practices
 1. Findings of Fact
 a. Non-statistical Findings
 b. Statistical Proof
 2. Conclusions of Law
 a. Disparate Treatment
 b. Disparate Impact
F. Summary of Conclusions of Law as to Class Claims

### A. Applicable Law

Plaintiffs allege discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The objectives of Title VII are clearly delineated in 42 U.S.C. § 2000e–2(a)(1) and (2), which make it unlawful:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Two judicial theories have been articulated by the Supreme Court to effectuate these objectives. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court enunciated the disparate treatment theory, and in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Court articulated the disparate impact theory. Either theory may be applied to a particular set of facts. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 325, 335 n. 15, 97 S.Ct. 1843, 1849, 1854 n. 15, 52 L.Ed.2d 396 (1977).

> "Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical....
>
> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive ... is not required under a disparate impact theory.

*Id.* Thus, these theories merely present alternative foundations upon which a court may base liability.

Title 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This statute reaches only conduct motivated by a discriminatory purpose, and does not apply to practices that merely have a disparate impact on a particular class. *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 388–91, 102 S.Ct. 3141, 3148–3150, 73 L.Ed.2d 835 (1982). The standards for evaluating a plaintiff's claim of purposeful discrimination under 42 U.S.C. § 1981 are the same as those applied to a claim of disparate treatment under Title VII. *Long v. Ford Motor Company,* 496 F.2d 500, 505 (6th Cir.1974).

The Court now examines the disparate treatment and disparate impact theories as they apply to class actions.

### 1. *DISPARATE TREATMENT*

To prove class-wide disparate treatment, plaintiffs must show a "systemwide pattern or practice" of intentional discrimination. *International Brotherhood of Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1854–1855. They must show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. [They must] establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* (footnote omitted).

The means by which plaintiffs in a class action claiming disparate treatment can meet their burden of proof was articulated by the Supreme Court in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). In *Franks* plaintiffs made out a prima facie case by introducing proof of a discriminatory pattern and practice sufficient to create a *rebuttable presumption* that defendant's decisions were the result of such a pattern

or practice. *Id.* at 773, 96 S.Ct. at 1268. The nature of this presumption was discussed by the *Teamsters* Court as follows:

> The holding in *Franks* that proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief is consistent with the manner in which presumptions are created generally. Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof. See C. McCormick, *Law of Evidence* §§ 337, 343 (2d ed. 1972); James, *Burdens of Proof,* 47 Va.L.Rev. 51, 61 (1961). See also *Keyes v. School Dist. No. 1,* 413 U.S. 189, 208–209, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548. These factors were present in *Franks.* Although the prima facie case did not conclusively demonstrate that all of the employer's decisions were part of the proved discriminatory pattern and practice, it did create a greater likelihood that any single decision was a component of the overall pattern. Moreover, the finding of a pattern or practice changed the position of the employer to that of a proved wrongdoer. Finally, the employer was in the best position to show why any individual employee was denied an employment opportunity. Insofar as the reasons related to available vacancies or the employer's evaluation of the applicant's qualifications, the company's records were the most relevant items of proof. If the refusal to hire was based on other factors, the employer and its agents knew best what those factors were and the extent to which they influenced the decision-making process.

431 U.S. at 359 n. 45, 97 S.Ct. at 1866–1867 n. 45. The Court further stated that plaintiffs are "not required to offer evidence that each person for whom [they] ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." *Id.* at 360, 97 S.Ct. at 1867. If plaintiffs satisfy this burden, defendant must show

> that the [plaintiffs'] proof is either inaccurate or insignificant. An employer

might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.

> If an employer fails to rebut the inference that arises from the [plaintiffs'] prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy.

*Id.* at 360–61, 97 S.Ct. at 1867–68.

### 2. *DISPARATE IMPACT*

The disparate impact theory, which originated in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), focuses on a facially neutral employment practice that falls more harshly on or adversely impacts a protected group, such as blacks, than others and that is not justified by business necessity. *See Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The *Griggs* Court stated: "[Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* 401 U.S. at 431, 91 S.Ct. at 853. It further stated: "Under [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430, 91 S.Ct. at 853. Thus, unlike the disparate treatment theory in which proof of discriminatory purpose is critical, plaintiffs proceeding under the disparate impact theory need not show intentional discrimination in order to succeed. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are un-

related to measuring job capability." *Id.* at 432, 91 S.Ct. at 854.

The order and allocation of the burden of proof in a disparate impact case is three-fold. First, plaintiffs "must show that the facially neutral employment practice had a significant discriminatory impact" on a protected group of which plaintiffs are members. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). They must identify a specific practice that results in a discriminatory impact on a class.

> The discriminatory impact model of proof in an employment discrimination case is not, however, the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices. Nor may just any employment practice be challenged under this model simply because an uneven racial balance exists in an employer's work force. As originally conceived in *Griggs v. Duke Power Co.,* an action in which a group of black employees challenged their employer's requirement of a high school diploma and a satisfactory score on two aptitude tests for positions in several departments of a power generating facility, the disparate impact theory applied to an *"overt, clearly identified nondiscretionary selection criteri[on] that [was] applied at a single point in a selection process."* D. Baldus & J. Cole, Statistical Proof of Discrimination § 1.23, at 12 (1981 Supp.).

*Pouncy v. Prudential Insurance Co.,* 668 F.2d 795, 800 (5th Cir.1982) (emphasis added).

Second, if plaintiffs make out a prima facie case of discrimination, the burden shifts to the defendant to justify its challenged employment practice by showing business necessity or job relatedness. As stated by the *Griggs* Court, defendant must demonstrate that "any given requirement [has] a manifest relationship to the employment in question." 401 U.S. at 432, 91 S.Ct. at 854. The Sixth Circuit has stated:

> The test is whether there exists an overriding legitimate business purpose such

that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve.

*Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 879 (6th Cir.1973) (quoting *Robinson v. Lorillard Co.,* 444 F.2d 791, 798 (4th Cir.), *cert. denied,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)).

Third, if defendant shows the requisite business purpose, the burden shifts to plaintiffs to show that there are alternative employment practices "without similar discriminatory effect which would also serve the employer's legitimate interest in efficient and trustworthy workmanship." *Chrisner v. Complete Auto Transit, Inc.,* 645 F.2d 1251, 1257 (6th Cir.1981). "Such proof is evidence that the employment practice is being used merely as a pretext for discrimination." *Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 94 (6th Cir. 1982). *See Albermarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375; *Connecticut v. Teal,* 457 U.S. at 447, 102 S.Ct. at 2530–31.

### B. Use of Statistical Evidence

Class-wide discrimination can be found based on a significant number of individual acts of discrimination. *Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d 922, 929–30 (D.C.Cir. 1982).

> Sufficient individual instances of discrimination could show a pattern of discrimination. But if individual cases of discrimination are to show discrimination against the class as a whole, the number of instances must be significant when compared to the number of persons in the class. The court must focus on the ratio of the number of instances proved to the size of the class. The higher that ratio, the more likely discrimination has occurred against the class as a whole.

*Id.* In most such cases, however, "[s]tatistical analyses have served and will continue to serve an important role" in establishing racial discrimination. *Mayor of Philadel-*

*phia v. Educational Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed. 2d 630 (1974). Indeed, "[i]n many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination...." *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (1971). The Supreme Court, however, has cautioned "that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 340, 97 S.Ct. at 1856–57. The Court further defined the proper use of statistical evidence as follows:

> Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population. *See, e.g., United States v. Sheet Metal Workers Local 36*, 416 F.2d 123, 127 n. 7 (CA8). Considerations such as small sample size may, of course, detract from the value of such evidence, *see, e.g., Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620–621, 94 S.Ct. 1323, 1333, 39 L.Ed. 630, and evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants would also be relevant. *Ibid.*

*Teamsters*, 431 U.S. at 339 n. 20, 97 S.Ct. at 1856–57 n. 20.

Of course, statistical evidence, like any other evidence, is subject to rebuttal. In *Dothard v. Rawlinson*, 433 U.S. 321, 338–39, 97 S.Ct. 2720, 1855–56, 53 L.Ed.2d 786

(1983), Justice Rehnquist, concurring, acknowledged that a defendant in a discrimination case "may endeavor to impeach the reliability of the statistical evidence, [it] may offer rebutting evidence, or [it] may disparage in arguments or in briefs the probative weight which the plaintiff[s'] evidence should be accorded." A similar observation was made by the Fourth Circuit in *Roman v. ESB, Inc.*, 550 F.2d 1343, 1350 (4th Cir.1976):

> We do not believe that isolated bits of statistical information necessarily make a prima facie case when divorced from other and contrary statistics and from the statistical picture of all the employment at the plant. We also think the absence of other evidence of discrimination should be considered in determining whether a prima facie case is made, just as the presence of other evidence of discrimination should be considered in arriving at the same conclusion.

In reviewing statistical evidence, its evidentiary value "depends on the magnitude of the disparity it reflects, the relevance of its supporting data, and other circumstances in the case supportive of or in rebuttal of a hypothesis of discrimination." *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 646–47 (4th Cir.1983). Although there "are no hard and fast rules as to how much of a disparity is 'enough' to establish a prima facie case or withstand various defenses," S. Agid, *Fair Employment Litigation: Proving and Defending a Title VII Case* 540, 541 (2d ed. 1979), the United States Supreme Court has stated that "a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to race." *Hazlewood School District v. United States*, 433 U.S. 299, 312 n. 17, 97 S.Ct. 2736, 2743–44 n. 17, 53 L.Ed.2d 768 (1977). *See Castaneda v. Partida*, 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272, 1281–82 n. 17, 51 L.Ed.2d 498 (1977).

> [I]f the difference between an expected and an observed [result] exceeds two or three standard deviations it would not be a valid hypothesis to say that the ob-

served was drawn in an unbiased manner from the population from which the expected was computed.... Inversely one could say that when the observed results are within two or three standard deviations of the expected, there would be no reason, absent other factors, to doubt the proposition that the observed was the result of an unbiased selection from the known population.

*Garrett v. R.J. Reynolds Industries, Inc.*, 81 F.R.D. 25, 33 (M.D.N.C 1978). *See EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d at 647–48; *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 551 (9th Cir.1982).

Both plaintiffs and defendant introduced statistical evidence. Mr. Joshua Tankel testified concerning statistical exhibits he prepared for plaintiffs. Plaintiffs did not offer Mr. Tankel as a expert witness because he lacked the requisite qualifications to allow him to so testify. (Tankel Tr. at 817–20).[1] Mr. Tankel prepared "snapshots" of Firestone's work force for selected dates between 1972 and 1975 based on three sources of data received from Firestone: (1) employee profiles for non-exempt production employees active as of May 12, 1975; (2) a list of staff employees employed by Firestone on September 12, 1975, along with their employment history; and (3) a racially annotated seniority list. (Tankel Tr. at 785–87). The exhibits prepared by Mr. Tankel took the form of computer printouts arranging the above data into various categories. These exhibits presented only raw numbers and percentages. To the extent that Mr. Tankel did identify disparities between the treatment of blacks

and whites, he offered no measure of the statistical significance of these disparities. In reviewing plaintiffs' statistical data, the court has not attempted to fill in any gaps in their proof.

It is not for the court, trial or appellate, to search the voluminous record for data omitted from plaintiffs' comparative analyses, compensate for the failure to filter out the combined effects of factors unrelated to race or sex, choose the appropriate statistical methodology, and insert therein select parts of the array of figures presented.

*Pegues v. Mississippi State Employment Service*, 699 F.2d 760, 768 (5th Cir.1983). At the same time, the Court does not reject Tankel's testimony altogether, but reviews his findings as they become germaine in the discussion that follows.

Dr. David Peterson testified as an expert on behalf of Firestone. He was eminently qualified as an expert on statistics.[2] In preparation for his testimony, Dr. Peterson reviewed data concerning Firestone's employment practices and analyzed such data with respect to recruiting, hiring, promotions and terminations.

### C. Recruitment, Hiring and Initial Assignments

#### 1. FINDINGS OF FACT

##### a. *Non–Statistical Findings*

In late 1971, Firestone began construction of a large truck tire manufacturing facility in LaVergne, Tennessee. During the startup phase of the plant, approximately 25–30 Firestone employees from other plant locations were transferred to the LaVergne plant to set up equipment

---

1. At the time he testified, Mr. Tankel was employed as a research analyst by the NAACP Legal Defense Fund. In this capacity, he prepared statistical analyses for employment discrimination cases under the direction of an attorney. He had received a B.S. degree in economics, but he had only one course in statistics as an undergraduate and had neither taught statistics nor published any materials concerning statistics. He had taken several computer courses but they did not involve statistics. He had never qualified as an expert in any case.

2. Dr. Peterson received a Ph.D from Stanford University in electrical engineering, with an emphasis on the application of mathematics and statistics to engineering problems. He has taught mathematics and statistics at a number of major graduate schools of business administration for fifteen years. He has published a number of articles on the use of statistical data in evaluating the fairness of employment practices and has been a consultant to a number of private companies and federal, state and local government agencies on matters concerning the fairness of their employment practices. Finally, he has testified as an expert witness in two prior cases involving the use of statistics to evaluate the fairness of employment practices.

and train new employees. Most of these transferred employees occupied the initial managerial and technical positions in the plant. All of the transferred employees were white males who were selected from other Firestone locations by the new plant manager, James Bowles, through an interviewing process.

Soon after the announcement of the construction of the plant, Firestone began receiving applications from persons in the middle Tennessee area. Prior to the commencement of operations in the fall of 1972, over three thousand applications were received primarily from persons in Davidson, Wilson, Williamson and Rutherford Counties, and from other persons residing throughout middle Tennessee.

In order to screen the large number of applicants and to reduce the number of persons coming to the plant itself, Firestone entered into an arrangement with the Tennessee Department of Employment Security (DES) whereby all applicants for employment at the plant were referred to the Murfreesboro office of the DES to fill out an application and undergo initial testing and screening. The Murfreesboro office was designated by the DES since the plant was located in Rutherford County. Beginning in 1973, applications also were placed on file at, and applicants were referred by, the DES office in Nashville.

Applicants were administered standardized tests prepared by the DES to determine manual dexterity and other skills.

For each position ultimately filled at the plant, approximatley seven or eight persons were interviewed. Candidates were selected by the DES from the pool of applicants for referrals to Firestone for interviews for specific job openings. At the time of the interview, applicants were administered a Business Sentence Completion Questionnaire that required applicants to answer a lengthy series of open-ended sentences.[3] Applicants were not graded on their responses, but the questionnaire was reviewed by the panel interviewing an applicant and often were discussed in the interview itself. At the request of the NAACP, the use of the questionnaire was discontinued in early 1974.

Interviews of potential applicants were conducted by a panel comprised of three or more Firestone employees. One representative of each panel was a member of the personnel department who was utilized to insure uniformity in the interviewing process and compliance with employment laws. The other members of the panel were representatives of the various operating departments in the plant for whom applicants were being sought. Initially, all of the interviews were attended by T.S. Bragg, the first personnel manager of the plant. Subsequent interviews were conducted by other personnel representatives, including Dennis Brown, Steve Quarles, and Sal Constanza. Mary Bryant, a black female who was initially employed as a secretary in the personnel department, was promoted to the position of "interviewer" on May 1, 1974, and thereafter conducted substantially all of the interviews.

At the conclusion of each interview, members of the panel completed a ballot (Ex. P–105) on which the applicant was rated according to his or her perceived ability to successfully perform the job safely and efficiently based on prior experience and responses given in the interview session. Beginning in 1972, approximately seven employees were hired each week, and by the end of 1973, a total of 488 persons were employed. The plant continued to grow so that at the time of the trial there were approximately 800 production employees and 400 staff, clerical, and management employees.

---

**3.** The Business Sentence Completion Questionaire contained fifty (50) incomplete sentences. Applicants were told to "[m]ake a complete sentence to express your real feelings." The first five (5) questions read:

 (1) Most employees _____.
 (2) The future of the company _____.
 (3) A company suffers most _____.
 (4) Most supervisors and managers _____.
 (5) The best way to deal with low job performance in your subordinates _____.
 (Ex. P–14).

All employees of the LaVergne plant were paid on a salaried basis and all received the same fringe benefits from the lowest production employee through the plant manager. All production employees were hired at the same starting rate.

At trial, testimony pertaining to alleged discrimination in defendant's recruiting and hiring practices, and in its initial assignments, was given by many witnesses. In particular, six of the named plaintiffs—James Hunter, Thelma McHenry, Bobby Ivy, Alice Gail Cook, and Joseph Johnson—and five other members of the class—Frances Wilfong Cox, George McLaurine, Willie Mae Caldwell McLaurine, William Douglas Henry, and Issac Allen—claimed that they were victims of discrimination in these areas. With respect to the six named plaintiffs, the Court does not pause to restate the findings of fact it enunciates later in this Memorandum. The Court now makes findings of fact with respect to the five other members of the class.

Frances Wilfong Cox's first contact with Firestone occurred in November of 1973 when she received a letter from Mr. Bragg advising her that he had been given her name by Mr. Kincade as a person who might be interested in employment with the company. (Ex. P–47). Cox submitted an application in which she did not apply for any particular position, and shortly thereafter she discussed the possibility of a public relations or personnel position with Mr. Bragg. She had no further contact with defendant regarding her employment. Defendant offered no testimony concerning Cox's application.

George McLaurine applied for employment as a production supervisor in May of 1973. He was interviewed in September and offered a position in "office services" that involved the distribution of mail, relief of the switch board operator, some bookkeeping or accounting work, and the ordering of supplies. (McLaurine Tr. at 202–205). He declined this position because he would have earned no more than he was currently making and because he saw no future in the job. (McLaurine Tr. at 202). In 1974, McLaurine was interviewed a second time for a position as a timekeeper, but he did not receive an offer for that position.

Willie Mae Caldwell McLaurine applied for a position in the laboratory at Firestone in April of 1973, but was not interviewed. (Ex. P–46). She had a degree in clothing and textiles from Tennessee State University, but had no prior experience in a laboratory. No evidence was presented by either side as to other persons who applied for a position in the laboratory or who were hired for this position.

William Douglas Henry applied for employment at Firestone twice in 1972. He was interviewed by Dennis Brown. During the course of the interview, Mr. Bragg came into the room and stated to Brown that Henry would not be hired because he was overweight. (Henry Tr. at 244). At the time, Henry weighed approximately 260 lbs. and was 5'11" tall.

Issac Allen testified that he applied for employment with defendant Firestone in November of 1974 or 1975 and that one to two weeks after filing his application he was interviewed. Allen testified that he never received any word from the defendant regarding his employment. The defendant introduced a letter dated April 3, 1974, advising Allen that he would not be hired. (Ex. D–406). Allen stated that he did not receive the letter.

### b. Statistical Proof
#### (i) Plaintiffs' Statistical Proof

Mr. Tankel identified no disparities and presented no statistical proof related to Firestone's recruiting practices. He did provide statistical proof related to its hiring practices and initial assignments. His testimony and the exhibits he submitted in this regard, however, provide the Court with only raw data and evidence of isolated disparities.

Tankel attempted to show a disproportionate concentration of blacks in certain departments that other witnesses claimed were undesirable. Toward that end, he identified isolated disparities between the actual and expected number of blacks in particular departments. He failed, however, to show a consistent pattern or prac-

tice of discrimination through these isolated disparities and he made no attempt to measure the statistical significance of the degree to which blacks were underrepresented in any particular department in proportions greater than one would expect.

The Court finds that plaintiffs statistical evidence relating to defendant's hiring practices and initial assignments is severely deficient and incomplete. It plainly cannot support a finding of class-wide discrimination and, therefore, the Court does not make specific factual findings with respect to it.

### (ii) *Defendant's Statistical Proof*

Before analyzing the specific data concerning Firestone's employment practices, Dr. Peterson explained three basic principles that affect the representation of blacks in the local labor market: (1) the distance principle—given the opportunity, people prefer to travel shorter distances to work than longer distances, all other things being equal; (2) the density principle—more persons will be drawn to an area from a more populous area than from a less populous area, all other things being equal; and (3) the representation principle —persons drawn from a particular geographic area will generally be representative by race of the people residing in that area. (Peterson Tr. at 2–11).

In measuring the availability of blacks in Firestone's relevant labor market, Dr. Peterson utilized the residence patterns of applicants and employees to take into account the competing effects of distance, density and representation. (Peterson Tr. at 1, 25). Dr. Peterson weighted the contribution of each county to the plant's labor market by the number of persons from that county who applied to work at Firestone. This calculation was done for each of the seven EEO–1 categories in which Firestone has employees. The availability of blacks for each category, as shown by Exs. D–296 and 293, was as follows:

| EEO–1 Category | Blacks as % of Labor Force |
| --- | --- |
| Officials and Managers | 2.8% |
| Professionals | 4.9% |
| Technicians | 3.5% |
| Office and Clerical | 8.7% |
| Craft Workers | 7.8% |
| Operatives | 17.2% |
| Service Workers | 10.8% |

In analyzing Firestone's recruiting practices, Dr. Peterson compared the number of actual black applicants to the number of blacks that one would expect to apply based on their availability in Firestone's relevant labor market. (Peterson Tr. at 6, 59). To determine the significance of any disparity, Dr. Peterson measured the number of standard deviations by which the actual number of black applicants differed from the expected number of black applicants. For each of the EEO–1 job categories for which Firestone recruits, Dr. Peterson compared the percentage of actual applicants who were black to the availability of blacks for that particular job category for the period from September 1973 to June 1978. Separate comparisons were performed for the period September 1973 to March 1974, and for each of the succeeding calendar years. (Ex. D–272, 273, 275, 276, 278, 279, 291, 282, 284, 285, 287, 288). For the comparisons that follow, a minus standard deviation indicates that the number of blacks is below what one would expect, and a positive standard deviation indicates that blacks are represented in numbers greater than one would expect.

For the officials and managers job category, blacks were overrepresented in three of the six time periods to the extent of $+4.7$, $+4.1$ and $+5.2$ standard deviations. In the other three periods, blacks were underrepresented to the extent of $-0.3$, $-0.2$ and $-0.2$ standard deviations. (Ex. D–272). For the professionals job category, blacks were overrepresented in four of the six time periods to the extent of $+1.9$, $+2.6$, $+0.5$ and $+3.0$ standard deviations. In the two remaining periods, blacks were underrepresented to the extent of $-0.7$ and $-0.2$ standard deviations. (Ex. D–275). For the technicians job category, blacks were overrepresented in five of the six time periods to the extent of $+1.0$, $+7.2$, $+5.3$, $+2.7$ and $+2.4$ standard deviations. In the single remaining time period blacks were underrepresented to the extent of $-0.4$ standard deviations. (Ex. D–278). For the

office and clerical workers category, blacks were overrepresented in five of the six time periods to the extent of +0.8, +3.3, +1.6, +7.0 and +4.4 standard deviations. In the remaining time period, blacks were underrepresented to the extent of −0.8 standard deviations. (Ex. D–281). For the operatives job category, blacks were overrepresented in all five of the time periods for which there were applicants to the extent of +3.1, +3.8, +2.6, +9.2 and +6.1 standard deviations. (Ex. D–284). For the service workers job category, blacks were overrepresented in all four of the time periods for which there were applicants to the extent of +2.2, +0.4, +1.8 and +0.7 standard deviations. (Ex. D–287).

In analyzing Firestone's hiring practices and initial assignments, Dr. Peterson performed two sets of comparisons: (1) a comparison of the number of blacks one would expect to be hired based on their availability against the number of blacks that were actually hired for each of the six EEO–1 categories into which Firestone hires; and (2) a comparison of the number of blacks hired into each job category against the number of blacks who actually applied. Comparisons were made for the same time periods used to analyze the recruitment data. The data included all those who were hired during the relevant time period, not merely those who were hired and remained employed by Firestone at some later date. (Peterson Tr. at 74–75).

For the officials and managers job category, the percentage of black hires differed from the percentage one would expect based on their availability to the extent of −0.2, −0.2, −0.2, −0.2 and −0.2 standard deviations respectively for each of the five time periods for which Firestone hired into that job category. The percentage of black hires differed from the percentage one would expect based on their actual applicant flow to the extent of −1.1, −0.6 and −0.8 standard deviations respectively for each of the three relevant time periods for which Firestone received applications for that job category. (Ex. D–274).

For the professionals job category, the percentage of black hires differed from the

percentage one would expect based on their availability to the extent of +1.7, +2.8, −0.3, −0.5, +4.7 and −0.2 standard deviations respectively for each of the relevant time periods. The percentage of black hires differed from the percentage one would expect based on the number of black applicants to the extent of +0.6, +1.1, −0.8 and +1.6 standard deviations respectively for each of the relevant time periods for which Firestone received applications for that job category. (Ex. D–277).

For the technicians job category, the percentage of black hires differed from the percentage one would expect based on their availability to the extent of −0.4, +5.5, +1.8, −0.2, −0.3 and +5.3 standard deviations respectively for each of the relevant time periods. The percentage of black hires differed from the percentage one would expect based on the number of black applicants to the extent of −0.7, +0.7, −0.5, −0.4 and +1.7 standard deviations respectively for each of the relevant time periods for which Firestone received applications for that job category. (Ex. D–280).

For the office and clerical workers job category, the percentage of black hires differed from the percentage one would expect based on their availability to the extent of −0.7, +2.2, +1.6, +3.3, −0.7 and −0.4 standard deviations respectively for each of the relevant time periods. The percentage of black hires differed from the percentage one would expect based on the number of black applicants to the extent of −1.0, +0.5, +0.8, −0.1 and −1.6 standard deviations respectively for each of the relevant time periods for which Firestone received applications for that job category. (Ex. D–283).

For the operatives job category, the percentage of black hires differed from the percentage one would expect based on their availability to the extent of +3.1, +1.4, +0.8, +3.0, +3.0 and +1.3 standard deviations respectively for the relevant time periods for which Firestone hired into that job category. The percentage of black hires differed from the percentage one would expect based on the number of black applicants to the extent of +1.3, −0,9,

−0,5, −1.7 and −2.4 standard deviations respectively for each of the relevant time periods for which Firestone received applications for that job category. (Ex. D–286).

For the service workers job category, the percentage of black hires differed from the percentage one would expect based on their availability to the extent of +2.9, +0.9, +1.3 and −0.3 standard deviations respectively for each of the relevant time periods for which Firestone hired into that job category. The percentage of black hires differed from the percentage one would expect based on the number of black applicants to the extent of +1.4, +0.7, +0.0 and −0.5 standard deviations respectively for each of the relevant time periods for which Firestone received applications for that job. (Ex. D–289).

Ex. D–292 summarizes the hiring versus availability data for the period 1974 through June 1978. This exhibit demonstrates that the number of blacks hired into each job category, with the exception of the officials and managers job category, is significantly greater than what one would expect based on their availability. In the officials and managers job category, the percentage of black hires differed from the percentage one would expect based on their availability to the extent of only −.42 standard deviations. (Peterson Tr. at 84–86). For the same period of June 1974 through June 1978, a comparison of black hires against their availability, broken down by detailed occupational job categories, reveals that in virtually every category in which there has been any significant amount of hiring, the percentage of black hires substantially exceeds the percentage one would expect based on their availability. (Ex. D–297).

## 2. CONCLUSIONS OF LAW

### a. *Disparate Treatment*

▮▮▮ Plaintiffs' proof consisted primarily of testimony by members of the class and statistical proof submitted by Mr. Tankel. With respect to testimony by members of the class, the Court notes that only one named plaintiff is later found to have been the victim of individual intentional discrimination in defendant's hiring practices, and no plaintiff is found to have been the victim of such discrimination in defendant's recruiting practices or initial assignments. The Court does not make specific conclusions of law as to other members of the class who testified, but it finds that their testimony is insufficient to establish by a preponderance of the evidence that racial discrimination was the defendant's "standard operating procedure" in any of these areas. With respect to statistical proof submitted by the parties, plaintiffs' statistical evidence plainly does not create a rebuttable presumption that defendant's actions were discriminatory. On the other hand, defendant's statistical proof shows that any racial variance between expected and observed results in the areas of recruiting, hiring, and initial assignments was within three standard deviations. To establish a prima facie case of class-wide disparate treatment based on statistical proof, the variance must exceed two to three standard deviations.

With respect to Firestone's recruitment practices, the proof at trial indicated that the construction of the LaVergne plant was widely publicized throughout middle Tennessee. As a result, over 3,000 applications were received by Firestone shortly before construction of the plant was completed. Statistical proof submitted by defendant demonstrated that the number of black applicants consistantly exceeded the number that one would expect based on their availability. There was no evidence that any of defendant's recruitment practices were used as an intentional device to discriminate against blacks.

With respect to defendant's hiring practices, the proof showed that defendant initially directed all applicants, regardless of race, except for employees transferred from other plants, to the Murfreesboro office of the Tennessee Department of Employment Security (DES). Some blacks found this requirement onerous, but plaintiffs failed to show that this requirement was used as an intentional device to exclude or discriminate against blacks. Indeed, statistical data presented by Fire-

stone showed that blacks applied in numbers at least as great as could reasonably have been expected given their availability. Beginning in 1973, applications also were received by the DES office in Nashville. Applicants were administered standardized tests prepared by the DES. There was no evidence that these tests were used as an intentional device to discriminate against blacks.

Applicants referred to Firestone by the DES for interviews were required to complete a business sentence questionnaire. Although plaintiffs objected to the fashion in which the questionnaire was framed, there was no evidence that it was used as an intentional device to discriminate against blacks in hiring. In addition, applicants were interviewed by a panel comprised of three or more Firestone employees. Likewise, this practice cannot be characterized as a means of discriminating based on race. Statistical proof submitted by defendant showed that blacks were hired in numbers commensurate with what one would expect based on their availability.

With respect to initial assignments, the proof indicated that some departments were less desirable than others. Plaintiffs did not show by a preponderance of the evidence, however, that blacks were assigned disproportionately to the undesirable departments. The proof further showed that work in less desirable departments ordinarily was compensated at higher rates. In addition, statistical proof submitted by Firestone pertaining to initial assignments indicates that blacks were assigned to different categories identified by the EEOC in numbers commensurate with their availability.

In sum, the Court finds that the testimony at trial and statistical evidence submitted, viewed separately and together, demonstrate that defendant did not maintain a systemwide pattern or practice of intentional discrimination in its recruiting, hiring, and initial assignments. The Court hereby ENTERS JUDGMENT for defendant as to plaintiffs' disparate treatment claims in these areas.

### b. *Disparate Impact*

To establish a prima facie case of discrimination under the disparate impact theory, plaintiffs must prove that (1) Firestone utilized an objective, facially neutral recruiting, hiring, or initial assignment practice that (2) had a disproportionate impact upon blacks. Only four components of Firestone's recruiting, hiring, and initial assignment practices qualify as objective, facially neutral practices: (1) requiring applications to be filed through the Murfreesboro office of the DES; (2) administration to applicants of standardized tests prepared by the DES; (3) use of a business sentence questionnaire; and (4) use of the panel interviewing system. Plaintiffs failed to show, however, that any of these had a disparate impact on blacks. Indeed, as noted earlier, the statistical evidence submitted by defendant indicates that the recruitment, hiring, and initial assignment of blacks was within two to three standard deviations of what one would normally expect. As a result, the Court must ENTER JUDGMENT for defendant as to plaintiffs' claims of disparate impact in these areas.

### D. Promotions

### 1. FINDINGS OF FACT

#### a. *Non–Statistical Findings*

All production employees at Firestone were initially employed as a production operator or production specialist. As employees acquired additional skills they progressed to the position of senior production operator. The highest production classification was production leader, a highly skilled level that was held by only a few production employees.

Although the employees were not covered by the terms of a collective bargaining agreement, in the latter part of 1973, a formal seniority and transfer system was adopted and made applicable to all production employees. (Ex. D–6). This system, as subsequently amended from time to time (Ex. D–7), controlled all transfers within the plant by production employees. The system permitted employees to express

an interest in a transfer to a particular department through a transfer request filed with the personnel department. When openings became available in that department, the system required an employee to accept a transfer once notified that his bid had been successful. Voluntary transfer requests were limited only to a specific department so that the employee was required to accept any vacant position that became available regardless of classification, work activity, crew, or shift. Employees were restricted to one voluntary transfer within a twelve month period. The system also restricted the number of transfers from a given department to no more than two employees per month.

After the initial plant startup, most supervisors, and virtually all promotions to supervisory positions, were selected from existing employees at the LaVergne plant. In order to be eligible for promotion to a supervisory position, production employees had to successfully complete a pre-supervisory training program that was initially open to all employees on a self-nominating first-come, first-serve basis. Beginning in January of 1976, the program was revised so that employees participating in the pre-supervisory training program were selected through an interviewing process although all employees were eligible to apply for that training. (D–310, 311, 312, 313). All employees who had completed the earlier pre-supervisory training program were given the opportunity to participate in the new program. All employees were advised in 1976 that no supervisory promotions would be offered to employees thereafter who had not completed the new program. (D–314).

All production employees were hired at the same starting rate. Subsequent increases were granted as employees became qualified in their job skills and thereafter by periodic reviews based on merit. The timing and amount of such increases were determined by performance reviews in a variety of areas, e.g., productivity, safety, and attendance.

At trial, testimony pertaining to alleged discrimination in Firestone's promotions was given by four of the named plaintiffs—Bobby Lee Kincaid, James Hunter, Mary Fite, and Thelma McHenry—and four other members of the class—James Kinser, Gerry Babb, John Moore, and James Smith. With respect to the four named plaintiffs, the Court does not pause to restate the findings of fact it enunicates later in this Memorandum. The court now makes findings of fact with respect to the four other class members who testified.

James Kinser was hired by Firestone in August of 1973 as a production operator in the warehouse. He was promoted to the position of senior production operator after working for nine months. Thereafter, he also served as a provisional or back-up supervisor. He expressed an interest in being promoted to a full time supervisory position and toward that end he attended numerous supervisory training classes offered by defendant. He also completed a training program offered by Nashville Technical Institute. In January of 1976, defendant established a full pre-supervisory training program. All employees, including Mr. Kinser, were told that completion of the course was required of all persons who desired promotion to a supervisory position. Kinser did not take this training program.

In March of 1977, Kinser transferred to the quality assurance department, where he was employed at the time he first testified on July 2, 1980. Mr. Kinser again testified on July 30, 1981. He reported that he had been offered a position as supervisor in the quality assurance department, but had turned it down because it was on the graveyard shift (12:00 a.m.—8:00 a.m.) and another white employee was given preference over him by being given the daytime shift.

Gerry Babb was hired in June of 1973 and assigned to the curing and final inspection department. He contends that a white employee, Richard Barnett, who was hired at the same time as he, was given more training and subsequently promoted to a supervisory position in curing. Babb testified on cross-examination, however, that at least one supervisor and the foreman in

that department were black. Moreover, he applied for and received a promotion to the position of senior engineering aide after he had worked for defendant for about six months.

Babb also asserts that he was denied promotions while working as a senior engineering aide. First, he contends that he trained a white employee, Joe Nock, who had less seniority but who was promoted over him. On cross-examination, however, Babb acknowledged that the position to which Nock transferred was a lateral move, not a promotion, and he was offered a similar transfer that he rejected. Second, he asserts that he was denied a promotion to a supervisor's position in the Banbury Department. Babb testified that he interviewed for the position with Paul Degeest, but was told at the end of the interview that the position had already been filled. Third, he contends that he was denied a supervisory position in the warehouse. After being refused a supervisory position in Banbury, Babb complained to Mr. Miles, the plant manager. Miles put Babb in touch with Darryl Teague, the warehouse department manager, who interviewed him for the position. Babb also was denied this position.

In March of 1975, Babb sought a promotion to the position of engineering assistant. He was given this position. In 1977, approximately one year prior to his testifying, Babb sought but was denied a supervisory position in the product evaluation department.

John Moore applied for employment with the defendant initially in September of 1975. He was interviewed by Mr. Costanza and Mr. Jeff Phillips of the personnel department, and was advised that he was over-qualified for a job in production. (Moore Tr. at 6). Moore had a degree from Tennessee State University and two to three years experience as a store manager or assistant manager for a regional discount chain. Moore reapplied in January of 1976. After a second interview, Moore again was told that he was over-qualified, but he was offered a position after he told the interviewers that he felt that their fail-ure to hire him was discrimination. He was hired as a production operator in the stock preparation department beginning January 16, 1976.

Moore contends that he was discriminated against by being denied three promotions. First, at some point in 1977, he applied for but was denied a position in the laboratory. Although Moore had a degree in biology that involved some chemistry, he was told that he did not have enough chemistry for the position he was seeking. Second, during this time period he also applied for but was denied a position in technical services. He was interviewed for this position by Mary Bryant, a black female, but did not receive the position. Third, in 1978, he interviewed for but was denied a position as an x-ray technician in the quality control department. John Payne, quality assurance department manager, testified that in the early stages of the development of the quality assurance department, approximately fifteen to twenty percent of the employees were black. He testified that in 1978 after additional persons were added in x-ray and other areas, approximately thirty to thirty-five percent of the department was black. (Payne Tr. at 560–1).

James Smith was employed by defendant on April 1, 1973, as a tire inspector in the final inspection department. Through the time of his testimony in August of 1980, he received three promotions. He claims, however, that he was discriminatorily denied a number of other promotions. First, he contends he was denied a promotion from production operator to senior production operator after working for six months. The evidence introduced at trial indicates that these promotions ordinarily were given as a matter of course. Further, Smith testified that at least one white employee was promoted with three months less service. In December of 1973, Smith was transferred to the quality assurance department in a product evaluation (x-ray) position and was promoted to senior production operator.

While working in quality assurance, Smith claims he was denied promotions to

"advance" jobs in that department. Smith identified two employees, one white and the other black, who received these positions. He testified that he was told by his department manager that he was not promoted because he had a "bad attitude, absenteeism problem, was immature and needed experience in the department where he was." (Smith Tr. at 169–72). He was later offered an "advance" job in statistical quality control, but he initially turned down the offer because he learned Jerry Watson, a white employee, was being given a five day a week, day job with weekends off that he desired. Smith admitted, however, that the transfer of Watson was "just a lateral move." (Smith Tr. at 177). He later accepted the position he initially turned down.

While working in SQC, Smith claims that he was denied three further promotions. First, he contends that in 1978, he was interviewed for but denied a junior engineering assistant's position in technical services. Approximately six months later, he was denied a tire development job. In addition, he was not promoted to a position as a supervisor in x-ray. The supervisory positions were awarded to two black males, a white female, and a white male. His department manager, John Payne, testified that these employees were clearly better qualified than Smith. At the time of his testimony, he was employed as an engineering assistant in the laboratory.

### b. *Statistical Proof*
#### (i) *Plaintiffs' Statistical Proof*

On behalf of the plaintiffs, Mr. Tankel submitted statistical proof pertaining to promotions. His testimony and the exhibits he submitted, however, provide the Court with only raw data. He attempted to demonstrate the existence of discrimination in promotions by identifying isolated disparities, but he failed to show that these disparities were typical or part of a consistent pattern of discrimination. Moreover, he made no attempt to measure the statistical significance of these selected disparities. In sum, the Court finds that plaintiffs' statistical evidence relating to promotions is severely deficient and incomplete. Accordingly, the Court does not make specific factual findings with respect to this evidence.

#### (ii) *Defendant's Statistical Proof*

In analyzing Firestone's promotion data, Dr. Peterson performed two sets of comparisons: (1) a comparison of the speed of promotion—whether blacks had to spend a longer time in a particular job category than whites before being promoted; and (2) a comparison of the wage advancement of blacks compared to that of whites. Dr. Peterson examined the actual salary of each individual, which may have included shift differentials or merit raises. (Pet.Tr. at 89–90).

Dr. Peterson compared the average seniority for whites and blacks at the time of their promotion to a different EEO–1 category for each of the years 1974 through June 1978. (Ex. D–266, 267). For the twenty instances in which there were both white and black promotions, and thus a basis for comparison, blacks were promoted faster than whites in fourteen instances. The number of instances where blacks were promoted faster than whites exceeded by 2.53 standard deviations the number of instances one would expect if race were not a factor in determining job movement. (Pet.Tr. at 90–95).

Dr. Peterson performed the same comparisons for that same period for all job transitions involving a change in job title. (Exs. D–268, 269). Comparing each of the instances in which both whites and blacks were promoted, whites were promoted faster than blacks in slightly more instances, to the extent of a .9 standard deviation in favor of whites. (Pet.Tr. at 95–99).

Dr. Peterson also compared the rate of advancement in pay for blacks and whites by comparing the July 1978 average monthly salary of whites and blacks hired into the same initial job. The data analyzed included persons hired in each of the years 1972 through 1977. The comparisons revealed that the average salary of blacks was greater than that of whites in six instances and less than that of whites in eight instances, reflecting a .53 standard deviation in favor of whites.

For all dates of hire, and for all initial jobs, the average monthly pay of an individual black in July 1978 was $6.37 less than the average monthly salary of an individual white. (Ex. D–291). This difference reflects that the average monthly salary of blacks differed from what one would expect when compared to that of whites by .85 standard deviations. (Pet.Tr. at 103–09, 116–18).

## 2. CONCLUSIONS OF LAW

### a. *Disparate Treatment*

■ Plaintiffs' proof consisted primarily of testimony by members of the class and statistical proof submitted by Mr. Tankel. With respect to testimony by members of the class, the Court notes that only one named plaintiff is later found to have been the victim of individual intentional discrimination in this area. The Court does not make specific conclusions of law as to other members of the class, but it finds that their testimony is insufficient to establish by a preponderance of the evidence that racial discrimination was the defendant's "standard operating procedure" in the area of promotions.

The proof at trial pertaining to Firestone's promotion practices indicated that employees were accorded promotions largely at the discretion of senior employees in each department and the staff of the personnel department. There was evidence that this discretion resulted in variations in the rapidity with which some employees were promoted relative to others. There was no evidence, however, that defendant maintained a pattern or practice of discriminating against blacks in promotions. As noted earlier, plaintiffs' statistical evidence plainly was insufficient to create a rebuttable presumption that defendant's actions were discriminatory in this area. Defendant's statistical proof, on the other hand, showed that the advancement of blacks in terms of position and wages was within three standard deviations of what normally could be expected.

In sum, the Court finds that the testimony at trial and statistical evidence submitted, viewed separately and together, demonstrate that defendant did not maintain a systemwide pattern or practice of intentional discrimination in its promotion practices. Accordingly, the Court hereby ENTERS JUDGMENT for defendant as to plaintiffs' claims of disparate treatment in this area.

### b. *Disparate Impact*

■ To establish a prima facie case of discrimination under the disparate impact theory, plaintiffs must prove that (1) defendant utilized an objective, facially neutral promotion procedure that (2) had a disproportionate impact upon blacks. The Court finds that neither of these elements exists with respect to defendant's promotion practices. First, although Firestone adopted certain procedures, they involved a high degree of discretion and subjectivity on the part of the persons making promotional decisions. Thus, there was no objective, facially neutral promotion procedure. Second, as already noted, the statistical evidence introduced by defendant showed to the Court's satisfaction that blacks were not disproportionately excluded from advancement opportunities. Accordingly, the Court hereby ENTERS JUDGMENT for defendant as to plaintiffs' claim of disparate impact in this area.

### E. Disciplinary Actions and Termination Procedures

## 1. FINDINGS OF FACT

### a. *Non–Statistical Findings*

The proof at trial showed that Firestone maintained procedural guidelines pertaining to disciplinary actions and termination procedures. These procedures, however, were not cast in stone, but were followed in most instances. When a situation arose warranting disciplinary action, a warning—either verbal or written—was usually issued. A verbal warning could be issued to an employee at the discretion of his or her supervisor for minor infractions, and a note indicating that such a warning had been given was placed in the employee's file. A written warning would be issued to an employee for more severe infractions but such

a warning required the review and approval of the personnel department.

For both types of warnings, if an incident complained of did not reoccur within twelve months, the warning would be expunged from the employee's file. On the other hand, if an employee was issued a series of warnings, or if the infraction complained of was severe, the personnel department would review his or her file to determine whether the employee should be disciplined or terminated. No employee could be terminated without the approval of the personnel director. When any type of disciplinary action was taken, an employee could appeal the action to a review board made up of two co-workers and the plant manager, who had final authority.

At trial, testimony pertaining to alleged discrimination in Firestone's disciplinary actions and termination procedures was given by three of the named plaintiffs— Bobby Lee Kincade, Thelma McHenry, and Sharon McHenry—and three other members of the class—John Hunt, Charles Oldham, and Walter J. Oldham. With respect to the three named plaintiffs, the Court does not pause to restate the findings of fact it enunciates later in this Memorandum. The Court now makes findings of fact with respect to the three other class members who testified.

John Hunt was employed by Firestone in mid–1984 as a forklift operator. He was terminated two months later for sleeping on the job. Hunt denied this and testified that at the time he was sitting on his tow motor waiting for other workers to catch up. He had received no prior warnings for such behavior.

During his two month tenure, Hunt was sometimes required to take an alcohol test and he was constantly watched by his supervisor, Marvin Barnett. On the night prior to his termination, Hunt wore a union button to work. Hunt testified that he thought this also may have been a cause of his termination. Defendant offered no testimony rebutting Hunt's testimony.

Charles Oldham was employed by the defendant in December of 1974 as a radial tire builder. He was terminated in March or April of 1976 for absenteeism by Norm Hill, a black staff personnel representative. Oldham testified that he had never received a warning for absenteeism. On cross-examination, after being shown copies of written warnings bearing his signature regarding his attendance, however, Oldham admitted that he had been warned. (Oldham Tr. at 66–7). The defendant introduced copies of three written warnings given to Oldham for absenteeism and tardiness dated September 1, 1975, December 4, 1975, and February 22, 1976. (Exs. D–393, 394 and 395). Oldham admitted that he had had a number of absences, but contended that some white employees who were not fired missed as much as he did, although he could not identify any specific individuals.

Walter T. Oldham was hired by defendant in October of 1974 and assigned to the curing department as a production operator. Almost from the start, he had attendance problems. For example, he missed eight of his first thirty work days. His employment records further show that he received a verbal warning on November 30, 1974 (Ex. D–397), a written warning dated July 25, 1975 (Ex. D–399), and a written warning dated October 24, 1975. (Ex. D–400). Oldham further testified that he recalled receiving a warning dated February 13, 1976, and a warning from his foreman Mr. Barnett that he had to improve his attendance. (Ex. D–401).

Oldham contends that he was denied a promotion to senior production operator, which most employees received as a matter of course after being employed for six months. He also contends that he was terminated in February of 1976 because of his race, although his employment record indicates it occurred because of his attendance problems. Oldham testified that he appealed the termination through the defendant's review board and was reinstated. He was terminated a second time approximately two months later, however, again for attendance problems. His employment records show that he had six absences and was tardy on two days during that time period. (Ex. D–402).

b. *Statistical Proof*

(i) *Plaintiffs' Statistical Proof*

Mr. Tankel identified no disparities and presented no exhibits or other evidence that are relevant to the existence of discrimination in Firestone's disciplinary actions or termination procedures.

(ii) *Defendant's Statistical Proof*

Dr. Peterson did not perform a complete statistical analysis of defendant's disciplinary actions. However, he did perform an analysis of its termination practices, and disciplinary actions were considered in this study. In analyzing Firestone's terminations, Dr. Peterson performed two sets of comparisons: (1) a comparison of the seniority of whites and blacks at the time of their termination to see if blacks were terminated sooner or with less seniority than whites; and (2) a comparison between the proportion of blacks among those terminated and the racial composition of employees with unexcused absences or "no reports" and the racial composition of employees receiving disciplinary warnings for absence and tardiness. (Pet.Tr. at 120).

For each job title at the plant, Dr. Peterson compared the seniority of blacks and whites at the time of termination for each of the years 1974–1978. (Ex. D–270, 271). For those instances where there were both blacks and whites terminated, and thus a basis for comparison, there were seven instances in which blacks had more seniority at the time of termination than whites and twelve instances where whites had more seniority than blacks. (Pet.Tr. at 120–22).

In an effort to compare the composition of persons deserving involuntary termination against the composition of persons who received it, Dr. Peterson compared the proportion of blacks among those involuntaily terminated with the racial composition of employees who received disciplinary warnings for absence and tardiness during the period from August 1974 to August 1975. (Exs. D–303, 304, 307, 308). That comparison revealed that blacks constituted 31.5 percent of those involuntarily terminated, 41.7 percent of those absent without excuse, and 28.1 percent of those who received disciplinary warnings for absence and tardiness. (Pet.Tr. at 123–24, 126–27).

Dr. Peterson performed the same comparisons for the period July 1977 to June 1978. (Exs. D–299, 300, 301, 302). During this period blacks constituted 15.8 percent of those involuntarily terminated, 42.0 percent of those absent without excuse and 32.6 percent of those who received disciplinary warnings for absence and tardiness. (Pet.Tr. at 128–29).

2. CONCLUSIONS OF LAW

a. *Disparate Treatment*

■ Plaintiffs' proof consisted primarily of testimony by members of the class who contended that they were subjected to disciplinary measures or were terminated for conduct for which white employees were not similarly disciplined. Plaintiffs submitted no statistical proof in support of their claim that disciplinary action was administered or terminations were made in a discriminatory manner. With respect to testimony by members of the class, the Court notes that none of the named plaintiffs were found to have been the victim of individual intentional discrimination in these areas. The Court does not make specific conclusions of law as to other members of the class, but it finds that their testimony is insufficient to establish by a preponderance of the evidence that racial discrimination was the defendant's "standard operating procedure" in the areas of disciplinary actions and terminations.

The proof at trial showed that Firestone had some procedural guidelines for disciplining employees, particularly in the area of absenteeism. For the most part, however, employees were issued warnings and given disciplinary action on an ad hoc basis. There was no evidence that defendant maintained a pattern or practice of discriminating against blacks in these areas. Indeed, defendant's statistical proof showed that blacks were not terminated in numbers disproportionate to the number of absences they had received.

In sum, the Court finds that the testimony at trial and statistical evidence presented, viewed separately and together, demon-

strate that defendant did not maintain a systemwide pattern or practice of intentional discrimination in disciplinary or termination practices. Accordingly, the Court hereby ENTERS JUDGMENT for defendant as to plaintiffs' claims of disparate treatment in those areas.

### b. *Disparate Impact*

To establish a prima facie case of discrimination under the disparate impact theory, plaintiffs must prove that (1) defendant utilized an objective, facially neutral disciplinary or termination procedure (2) that had a disproportionate impact upon blacks. The Court finds that neither of these elements exists with respect to defendant's disciplinary or termination practices. First, although Firestone adopted certain procedural guidelines in these areas, most disciplinary and termination decisions were made on a case by case basis. Thus, there was no objective, facially neutral disciplinary or termination procedure. Second, the statistical evidence introduced by defendant demonstrated that blacks were not disproportionately subjected to disciplinary action or terminated. Accordingly, the Court hereby ENTERS JUDGMENT for defendant as to plaintiffs' claims of disparate impact in these areas.

### F. Summary of Conclusions of Law as to Class Claims

In the foregoing discussion, the Court has considered whether plaintiffs were the victims of unlawful discrimination as a class in defendant's recruiting, hiring, initial assignments, promotions, discipline, and terminations. Having examined each of these claims individually, it has found that defendant must prevail as to each of these claims. Accordingly, judgment is hereby ENTERED for defendant as to plaintiffs' class claims.

### II. CLAIMS OF INDIVIDUAL PLAINTIFFS

The Court now considers claims of discrimination by the individual named plaintiffs in this action. These plaintiffs have asserted claims under both the disparate treatment and disparate impact theories. At this time, the Court considers only their disparate treatment claims. Plaintiffs' disparate impact claims were addressed earlier in the discussion of their class claims. The Court makes separate findings of fact and conclusions of law with respect to each plaintiff. Thus, the discussion of plaintiffs' individual claims proceeds as follows:

A. Applicable Law
B. Plaintiffs' Claims
 1. Bobby Lee Kincade
 a. Findings of Fact
 b. Conclusions of Law
 2. James O'Dell Hunter
 a. Findings of Fact
 b. Conclusions of Law
 3. Thelma McHenry
 a. Findings of Fact
 b. Conclusions of Law
 4. Mary Pope Fite
 a. Findings of Fact
 b. Conclusions of Law
 5. Sharon McHenry
 a. Findings of Fact
 b. Conclusions of Law
 6. Emily Henry
 a. Findings of Fact
 b. Conclusions of Law
 7. Bobby W. Ivy
 a. Findings of Fact
 b. Conclusions of Law
 8. Alice Gail Cook
 a. Findings of Fact
 b. Conclusions of Law
 9. Joseph Johnson
 a. Findings of Fact
 b. Conclusions of Law
C. Summary of Conclusions of Law as to Individual Claims

### A. Applicable Law

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court clearly delineated the allocation of the burden of proof in disparate treatment cases under Title VII and 42 U.S.C. § 1981. First, plaintiff must establish a prima facie case of race discrimination by showing:

(1) that he or she is a member of a minority;

(2) that he or she applied for and was qualified for a job for which the employer was seeking applicants;

(3) that despite his or her qualifications, he or she was rejected; and

(4) that, after his or her rejection, the employer filled the position with another person who was not a member of the plaintiff's racial minority.

411 U.S. at 802, 93 S.Ct. at 1824. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Due to factual distinctions among cases, the Supreme Court has acknowledged that not all of these elements may be applicable to every case. *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Thus, the *McDonnell Douglas* prima facie model of discrimination has been modified to apply not only when the plaintiff alleges discriminatory failure to hire, but also when the plaintiff alleges discriminatory failure to promote, *Burdine*, 450 U.S. at 248, 101 S.Ct. at 1091, discriminatory retaliation, *Harris v. Richards Manufacturing Co.*, 511 F.Supp. 1193, 1201 (W.D.Tenn.1981), *modified on other grounds*, 675 F.2d 811 (6th Cir.1982), discriminatory constructive demotion, *see Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982), and retaliatory dismissal, *Morvay v. Maghielse Tool Co.*, 708 F.2d 229, 233 (6th Cir.), *cert. denied*, 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983).

Second, if the plaintiff proves a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment practice. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant successfully meets this burden if it "raises a genuine issue of fact as to whether it dis...minated against the plaintiff." *Burdi...* 450 U.S. at 254, 101 S.Ct. at 1094. The defendant is not required to convince the Court that the actual source of its motivation was the proffered reasons. *Id.* The plaintiff's "prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for

the action; ... the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1095–96.

Third, if the defendant satisfies its burden, the plaintiff must demonstrate that the defendant's "proferred reason was not the true reason for the employment decision." *Id.* at 256, 101 S.Ct. at 1095. Restated, the plaintiff must show that the defendant's proffered justification is pretextual and unworthy of credence. *Id.* at 253, 101 S.Ct. at 1093; *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. The plaintiff may prove pretext either directly or indirectly. Direct proof of pretext consists of the plaintiff persuading the court, despite the defendant's proffered explanation, that it was motivated by a discriminatory animus. Indirect proof actually occurs throughout the trial by the plaintiff showing that the defendant's explanation is not credible or is unworthy of belief. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

During the pretext stage, the trial judge evaluates all the evidence and theories in order to determine which explanation of the challenged employment action it believes. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). Although the presumption of discrimination is considered successfully rebutted by the defendant at this stage, that rebuttal does not mean that the court cannot consider previously admitted evidence. Evidence presented in the plaintiff's case-in-chief as well as that offered by the defendant remains relevant. The Supreme Court acknowledged this procedural predicament in *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10:

In saying that the presumption drops from the case, we do not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case. A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the

plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

Thus, the pretext stage is a critical point in the trial not only because the issues are sharpened, but also because the trial court is considering all the evidence in order to determine whether purposeful discrimination has been proven.

As in all other civil litigation, the ultimate burden in Title VII and in 42 U.S.C. § 1981 cases is on the plaintiff to prove by a preponderance of the evidence the existence of discrimination in a challenged employment practice of the defendant. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482. "Although the burdens of production may shift between the plaintiff and the defendant, the burden of persuasion remains with the plaintiff at all times.... Because the burden of *producing* is much lighter than the burden of *persuading,* most ... disparate treatment cases are decided on the pretext issue." *Burton v. State of Ohio, Adult Parole Authority,* 798 F.2d 164, 166 (6th Cir.1986). In making the determination of whether discrimination has occurred, the Court should consider "reasonable inferences drawn from the totality of facts, the conglomerate of activities, and the entire web of circumstances presented by the evidence on the record as a whole." *Jeffries v. Harris County Action Association,* 425 F.Supp. 1208, 1216 (S.D.Tex. 1977), *vacated on other grounds,* 615 F.2d 1025 (5th Cir.1980). *Accord EEOC v. St. Joseph Paper Co.,* 557 F.Supp. 435, 439 (W.D.Tenn.1983).

### B. Plaintiffs' Claims

The Court now turns its attention to plaintiffs' claims that they were the victims of unlawful discrimination in defendant's employment decisions. The Court considers each plaintiff's claims separately.

### 1. *Bobby Lee Kincade*

#### a. *Findings of Fact*

Plaintiff Bobby Lee Kincade is a black man who applied for employment at defendant's LaVergne plant on August 28, 1972. He was interviewed in October and offered a position as a supervisor in the in-process inventory (IPI) department. He was one of the first supervisors hired in the plant, and his starting salary was the same as that of white employees hired in entry-level supervisory positions. At the time he was hired, and for approximately three (3) years thereafter, Kincade was Firestone's highest ranking black employee.

From the very beginning of his employment with Firestone, Kincade took an active role in promoting opportunities for black people at Firestone's LaVergne plant. First, he was the Chairman of the Labor and Industry Committee of the National Association for the Advancement of Colored People (NAACP), which expressed concerns regarding Firestone's hiring practices to the management at the LaVergne plant and to Firestone's corporate office in Akron, Ohio. Second, he met individually with the management of the LaVergne plant and with Frank Wohl, a representative of Firestone's Equal Employment Office, and Howard Fort, one of Firestone's attorneys, to discuss employment opportunities at the plant for black people. In the course of these discussions, Kincade was designated as a representative of management to hear complaints by black people about management. At his suggestion, management at the LaVergne plant established an Equal Employment Advisory Committee in the early part of 1974 to assist management in dealing with complaints of racial discrimination. This committee, however, only met three times during its life of three to six months and achieved no significant results. Finally, Kincade worked to secure the employment of several black persons, including plaintiffs James Hunter and Mary Pope.

From the date Kincade's employment with Firestone began on November 10, 1972, through August of 1973, he experi-

enced no discrimination in the terms and conditions of his employment or in the attitudes of his superiors. This fact is evidenced by an interoffice memorandum he sent on August 13, 1973, to T.S. Bragg that stated:

Since my employment with the Firestone Tire & Rubber Company on November 10, 1972, I have found the atmosphere at the LaVergne, Tennessee plant very conducive to learning every phase of my responsibilities. On numerous occasions, I have heard you and Mr. Robert Williams, my department manager, speak of the "open door policy" at this plant. Being new with this Company, I was somewhat skeptical about approaching top management with a problem that would be considered taboo in many other companies. When I discussed the attitudes of the minority employees with you and Mr. Jim Bowles on August 7, 1973, I was very much surprised to see the genuine interest that was shown concerning this matter.

It is not uncommon to see a company of this size bombarded with criticisms ranging from too much profit to the pollution of our environment. I feel certain that a company's positive qualities are very seldom recognized. At this point, it is with great pleasure that I congratulate you and the entire Firestone organization for the excellent job that has been done in the area of equal employment for all of Firestone's employees. This feeling was expressed most candidly by one of our employees when he related to Mr. Howard Fort and Mr. Frank Wahl that "for the first time on any job he feels like he is being treated like a human being." Since meeting with the top management of this plant and the two fine gentlemen from Akron, Ohio, I feel more like a member of this fine Company rather than an isolated part of it.

(Ex. D–13).

The first alleged incident of discrimination arose out of Kincade's transfer on May 2, 1974, from the IPI department to the tubing department. Kincade first expressed an interest in being promoted from supervisor to foreman in early 1974. He told Bob Williams, department manager of the production control department, that he wanted to be considered for the position of foreman in the waste control department. Williams told Kincade that he was qualified for this job, but he had too much potential to be in the waste control department and, therefore, the position was given to another employee, Ray Davis. Kincade also expressed interest in the position of foreman in the IPI department, a position that had not yet been created, but was being considered. Before any action was taken on this request, the company made a number of job reassignments on May 2, 1974. (Ex. D–57). Kincade was transferred from the position of supervisor in the IPI department to that of supervisor in the tubing department. Two white supervisors also were transferred: John Smith was transferred from the stock preparation department to the IPI department, and Donnie Chick was transferred from the tubing department to the stock preparation department. At the time of his transfer, Kincade was informed that, in the event the foreman position in the IPI department was created, he would not be able to transfer back from the tubing department to obtain the position. He also was told by Ray Letzler, the department manager in the tubing department, that if an opening arose for a foreman in his department, he would recommend that it be awarded to William Steel.

Due to the work rotation schedule, Kincade was off from work when the reassignment was announced by Williams and was advised of the transfer by telephone from Williams. On May 3, 1974, Kincade requested a meeting with Mr. Bowles, Mr. Miles and Mr. Bragg. In that meeting, Kincade expressed his objection to being transferred to the tubing department. Kincade advised Bowles, Miles and Bragg that he had seen his attorney and that he felt that he could "no longer trust or work with any of them so that any future communication should be directed to [his attorney]." (Ex. D–58). Kincade filed his initial charge of discrimination with the Equal

Employment Opportunity Commission on June 6, 1974. (Ex. P–63).

Firestone claims that Kincade was transferred to give him cross-training in a production control department, which would compliment his experience in IPI, a support department. It further asserts that Kincade's race had no bearing on the decision, and that the transfer was made to improve his chances of promotion in the future. Kincade asserts that he was moved so that the company could avoid promoting him to the position of foreman in IPI. In support of his position, Kincade introduced a copy of a confidential memorandum dated March 28, 1984, from Williams to Miles requesting authorization for the creation of a foreman's position in the IPI department. (Ex. D–56). The requisition form attached to this memorandum reflected Williams' selection of Mr. Joe Armstrong, another supervisor in the IPI department, for the foreman's position. The record indicates, however, that the request was denied by Miles and no position as foreman was created until ten months later, in February, 1975.

Both Bragg and Miles testified that after the May 3 meeting with Kincade, and because of the obvious restrictions which Kincade's announcement placed on the company's dealings with him, Kincade's opportunity for promotion was restricted until the fall of 1975. Bragg and Miles stated that although Kincade was considered for positions that came open during that period, where the qualifications of Kincade and another candidate were assessed as equal, Kincade's stated position regarding his relationship with the company and his superiors was considered as one of the deciding factors.

Kincade contends that his assignment to the tubing department exemplified the company's policy of assigning hot, hard and dirty jobs to black employees. He also asserts that he was discriminated against by Letzler, who assigned him to a crew that had a history of consistent failure to meet production quotas and who denied him training by Bill Alsup that was provided to white supervisors. He also asserts that during his year and a half in the

tubing department several white employees were promoted to positions as foremen who were no better qualified than he to fill those positions. On June 1, 1974, Mike Harrington was promoted to foreman in the stock preparation department. Harrington, however, had been employed in the Firestone Tire Plant in Memphis, Tennessee, for several years before coming to the LaVergne plant. Harrington had several years of experience in the stock preparation department both in the Memphis plant before coming to Nashville and as a supervisor in that department in the Nashville plant. Miles testified that Harrington was much better qualified for that position than Kincade. On January 1, 1975, Joe Armstrong was promoted to foreman in the curing department. Armstrong had served as a supervisor in IPI since the date he was hired and was rated by the company as "extremely strong" in dealing with people and in organizational skills. Armstrong was assessed as at least equally, if not better, qualified than Kincade. On February 1, 1975, Bobby England was promoted to foreman in the IPI department. England also had several years of supervisory experience before his employment by Firestone at the LaVergne plant. He was initially employed as a supervisor in the curing and final inspection departments and later transferred to a position as supervisor in the bias tire assembly department before his promotion to foreman. England had received excellent appraisals while employed by Firestone. Miles testified that England was deemed at least as well, if not better, qualified for that position as Kincade.

On December 1, 1979, Kincade was promoted to the position of foreman in the warehouse and shipping department. C.R. Russell, who had replaced Mr. Bragg as personnel manager in August of 1975, testified that after his transfer to Nashville, Kincade let it be known that he wanted a promotion and that he was willing to cooperate and work with the plant management. Kincade was interviewed by Russell and Norm Hill in October or November of 1975 and selected by Darryl Teague, department manager of the warehouse and

shipping department, for promotion to that position.

Kincade worked as foreman in the warehouse and shipping department from December of 1975 until his termination in May of 1977. During this one and a half year period, his relationship with Darryl Teague, the department manager, and with his subordinates progressively deteriorated.

Kincade was appointed to this position, in part, because Russell and Miles believed that he had strong public relations skills that would compliment Teague's strong technical skills. (Miles Tr. at 745, 747). Teague's poor public relations skills had been documented just prior to Kincade's appointment in a memorandum dated October 17, 1975, from C.R. Russell to J.M. Bowles, which stated:

> Darryl loses his control and displays violent temper. He often curses supervisors out in front of the other employees and throws fits of anger over things they do. He is often very hateful and will not speak to anyone. Other times he is so nice they wonder what he is up to.
>
> . . . . .
>
> Darryl has no concern for others feelings.
>
> . . . . .
>
> Today the employees hate to come to work and live in fear of his violent temper.

(Ex. P–119; *see* Russell Tr. at 355).

Not surprisingly, conflict arose between Teague and Kincade. Examples of situations in which conflict arose include the following: (1) Teague would not let Kincade know when he was going to be out of the plant, but instead would communicate this to subordinate employees; (2) Teague assigned Kincade to clean and add water to batteries of power trucks used in the warehouse, a job ordinarily assigned to low level production employees; and (3) Teague told Kincade that he could not order secretaries in the warehouse to type materials for him because he had no authority to do so. Teague's disregard for Kincade is apparent in a flow chart of authority Teague drew

**4.** See (Ex. P–78) for flow chart.

up in which he placed the foreman's position outside the main authority stream.[4]

As a result of the incidents discussed above, and other instances in which Teague failed to support Kincade in disputes with subordinates, Kincade complained to Russell, Miles, and Radosevich, the production manager. On one occasion Kincade reported to Russell that Teague was fostering racism in the warehouse and not supporting him in problems he was having with white supervisors. He stated that all four supervisors had been insubordinate by refusing to follow his instructions and that they had been supported by Teague. He then stated that he was taking the rest of the day off "to keep from slapping Darryl." (Ex. D–195). Russell and Radosevich held numerous meetings with Teague and Kincade in which they were told to work together or both would be replaced.

Kincade was accorded little respect by his subordinates, and, as a result, became embroiled in a variety of conflicts with them:

(1) Betty Williams, the warehouse secretary, refused to type a letter and she reported sick to someone else rather than him.

(2) Tom Weaver, a warehouse employee, carelessly burned a hole in the tile floor in Kincade's office with a hot branding iron.

(3) Three warehouse employees, Darrell Crossland, Chuck Stanfield, and Pat Saltkill, complained that he was showing favoritism to black employees.

(4) Kincade's orders to supervisors to reassign certain employees were refused or challenged; and

(5) James Neal, a white supervisor, refused a direct order to come to Kincade's office and, instead, rode off on his bicycle. These and other instances plainly indicate that Kincade encountered severe obstacles in directing the actions of many of his subordinates.

A final conflict that recurred throughout Kincade's final year with Firestone, and that ultimately was the basis for his termi-

nation, related to the branding of tires. The "brander" was required to use a hot iron to imprint certain information onto tires. Since the brander had to smell fumes from the burned rubber, branding was considered to be an undesirable task.

The conflict that emerged involving Kincade revolved primarily around a black warehouse employee, Bill Brown, and "B" crew. In July of 1976, Brown bid for and was awarded a position as brander on "B" crew. In November, however, the job of brander was found to have been posted improperly and, as a result, Brown became a regular warehouse employee. A meeting of "B" crew was held, and Brown volunteered to continue branding because he wanted to remain on "B" crew. The written decision of "B" crew was "unanimous: Bill Brown volunteered," and the employees also agreed to "rotate branding if Bill Brown is not here." (Ex. D–79). Kincade reported to Teague that the employees of "B" crew felt that "branding should be done by the junior man on the crew." (Ex. D–83).

Some months later, on April 9, 1977, Kincade held a meeting with the "B" crew to discuss the branding assignments. Kincade advised the employees that those employees with high seniority were pushing for a seniority system on branding whereas those employees with low seniority wanted to rotate branding, but that he believed branding should not be by seniority. (Ex. D–87). According to Kincade's notes of the meeting, he advised the employees that Teague supported the position that branding and other jobs in the department should not be assigned by seniority. (Ex. D–87). Teague testified, however, that in the first part of April, he had established a policy that the "floater," who was normally the least senior employee on each crew, was to do most of the branding, but that he should be relieved occasionally by other warehousemen so that he would not have to do all of the branding. On May 18, 1977, Miles established a branding policy under which branding would be performed by the floater, with the floater to be relieved every third day by one of the other warehouse employees. Kincade was advised of the policy and he made an entry in the log book stating that "no crews would be allowed to deviate from the policy." (Ex. D–95).

Since employees on the "D" crew had previously agreed unanimously to rotate branding, Andy Gamble, supervisor of that crew, requested and received permission directly from Miles for his crew to continue its previous practice. Permission was given by Miles, but Gamble was advised that if any employee should complain, the "D" crew also would have to follow the established policy.

In a meeting between Russell and Kincade held soon thereafter, Kincade stated that if the company allowed the deviation on "D" crew, it also should allow a similar deviation on the "B" crew. Russell responded that the company would allow such a deviation so long as everyone on the "B" crew agreed to it. Kincade 'advised Russell that the policy on branding should not be enforced until Brown's complaint that the assignment to him of branding was racially discriminatory had been resolved. Russell replied that Brown's complaint had nothing to do with the branding policy and that the "B" crew would not be allowed to rotate branding absent unanimous agreement by the entire crew.

On Sunday, May 22, Kincade called a meeting of the employees on the "B" crew to advise them that the branding policy had been modified. Kincade further advised them that because of the modification, the "B" crew would now have to rotate branding. Referring to the meeting held in November of 1976, Kincade stated that the crew had agreed that Brown would do the branding so long as he was the extra man and that otherwise branding would be rotated. (Ex. D–237, 240). When the employees objected that no agreement had ever been reached to rotate branding, Kincade instructed Harrison to tell the employees to return to work and asked Harrison to determine how the branding would be rotated on that shift. At Kincade's request, Harrison called the employees back to the office to ask them how they wanted to rotate the branding. The employees on

the crew replied that they wanted to follow the policy established by the plant manager. During the course of the meeting, Brown clinched his fist and made a rapid movement toward Saltkill stating that if Saltkill did not stop "talking behind his back, that he would _____ him up." Kincade grabbed Brown and told him to go into his office and thereafter dismissed the other employees to return to work. No report of this incident was made by Kincade to Teague, Russell or Miles. Following the incident, Saltkill contacted Russell at home to advise him of what had happened. Russell came to the plant and asked each employee to write up his version of the events that had transpired.

Kincade directed a memorandum to Teague on May 22 stating that he had "informed the employees assigned to 'B' crew that branding would be rotated since it was a unanimous decision by the entire crew." (Ex. D–236). On Monday, May 23, Kincade was scheduled to be off work. On that date, all of the employees on "B" crew except Brown presented Teague with written statements describing the incident that occurred on May 22, and Teague, in turn, forwarded them to Russell. Russell also obtained a statement from Harrison regarding the incident.

On May 24, Kincade was called to Russell's office to discuss the incidents that had occurred on Sunday, May 22. Kincade denied knowledge of any incident between Brown and Saltkill. When Russell began to ask Kincade questions about the incident, he refused to answer stating that he wanted to have his attorney present before he responded to any questions. Russell then advised Kincade that he wanted to ask about his change in the branding policy established by Miles. Kincade again refused to answer. Russell informed Kincade that he would either have to answer the questions or that he would have no alternative but to terminate him for countermanding a direct order of the plant manager. Kincade still refused to answer any questions and, as a result, was terminated by Russell and escorted from the plant. Teague was demoted shortly after Kincade's termination to a staff position.

### b. Conclusions of Law

Plaintiff Kincade alleges that he was a victim of intentional discrimination in the following areas: job assignments, promotion decisions, work environment, and termination practices. The Court considers each of these separately.

#### (i) Discriminatory Job Assignments

To establish a prima facie case of discrimination in job assignments, plaintiff must establish: (1) that he belongs to a protected racial group; (2) that he was given specific job assignments; and (3) that the circumstances surrounding the job assignments give rise to an inference of discrimination. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff Kincade contends that he was discriminated against twice in job assignments he received in 1974.

First, he asserts that he was discriminated against when he was transferred from IPI to tubing in May of 1974. The proof showed that in early 1974 Kincade expressed interest in the foreman's position in his department, IPI. At that time, and in May of 1974 when he was transferred from IPI to tubing, this particular position had not yet been created, but it was being considered. In March of 1974, just prior to Kincade's transfer, his department manager sent a memorandum to the plant manager in which he stated that if a foreman position was created in IPI, he would like Joe Armstrong to receive it. The testimony further revealed that Kincade was told at the time he was transferred that he would not be considered for this position if it became available. In addition to claiming that the transfer was designed to limit his promotion opportunities, Kincade asserts that he was transferred to tubing because it was a hot, hard, and dirty area of the plant. Based on these facts, the Court finds that Kincade has made out a prima facie case.

Defendant responds that the transfer to tubing promoted, not hindered, Kincade's promotion opportunities by giving

him cross-training in a production control department. In addition, it denies his contention that he was assigned to tubing because it was an undesirable area of the plant, and it asserts that the foreman's position in IPI was not created until many months after the transfer. The Court finds that Firestone's explanation constitutes a legitimate business justification.

▮ Turning to the question of whether this justification is pretextual, the Court finds that Kincade has failed to carry his burden of proving that defendant's decision to transfer him was based on his race. The circumstances surrounding the transfer do not indicate that it was a device to intentionally discriminate against him. In addition, Kincade's claim that he was transferred to tubing because it was a hot, hard, and dirty area of the plant was not supported by the record. In sum, the Court concludes that defendant's transfer of Kincade from IPI to the tubing department was not the result of intentional discrimination.

Second, Kincade asserts that while working in tubing he was discriminatorily assigned to a crew that had a history of consistent failure to meet production quotas and was not given training afforded other white supervisors. The Court finds that Kincade has not made out a prima facie case as to this claim. The record reveals that the productivity of the workers he was assigned to supervise may not have been the best at the outset, but under his direction they performed remarkably well. Under these circumstances, the Court must find that the circumstances surrounding this job assignment do not give rise to an inference of discrimination.

In sum, the Court concludes that Kincade was not the victim of intentional discrimination in defendant's job assignments. In reaching this conclusion, the Court also finds that there was no causal connection between his filing an EEOC complaint and defendant's employment decisions in this area, a necessary element for a claim of retaliation for filing such a complaint. *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir.1984).

*(ii) Failure to Promote*

To establish a prima facie case for a claim of discriminatory failure to promote, plaintiff must show: (1) that he belongs to a protected group; (2) that he applied for and was qualified for the position sought; (3) that he was considered for and denied the position; and (4) that he was rejected in favor of other employees of similar qualifications who are not members of his protected group. *Holland v. Dole*, 591 F.Supp. 983, 35 Empl.Prac.Dec. (CCH) ¶ 34591 (M.D.Tenn.1984); *Brown v. State of Tennessee*, 693 F.2d 600, 603 (6th Cir. 1983). Plaintiff Kincade contends that he was denied three promotions because he was black.

▮ First, he alleges that he was denied a promotion to the position of foreman in the stock preparation department in June of 1974. The Court finds that Kincade has made out a prima facie case of discrimination as to this claim. Defendant's asserted justification for not granting him this promotion is that the individual who was promoted, Mike Harrington, was more qualified. The record supports this contention and the Court finds that it constitutes a legitimate business justification. Kincade introduced no evidence to support the proposition that this justification was pretextual.

Second and third, he contends that he was denied promotions to foreman positions in the curing department in January of 1975 and in the IPI department in February of 1975. The Court finds that Kincade has made out a prima facie case as to both of these claims. Defendant asserts as a legitimate justification to these positions that those who were promoted, Joe Armstrong and Bobby England, were equally well qualified. In addition, it asserts that Kincade's statement in June of 1974, that he could "no longer trust or work with any of them" was a legitimate factor in its decision not to promote him. The Court finds that these explanations constitute legitimate business justifications and further concludes that Kincade has failed to show that these justifications are pretextual.

In sum, the Court finds that Kincade was not discriminatorily denied promotions by Firestone. In addition, it finds no causal connection between his filing an EEOC complaint and defendant's promotion decisions as is required for a retaliation claim. *Jackson,* 743 F.2d at 375.

#### (iii) *Racially Hostile Work Environment*

Generally stated, to establish a claim of racial harassment in the work environment at Firestone's plant, a plaintiff must show that the environment was permeated with a pervasive atmosphere of racially offensive conditions. More specifically, to make out a prima facie case, Kincade must show: (1) that he belongs to a protected racial group; (2) that he was subjected to excessive and pervasive harassment on the basis of his race; and (3) that Firestone failed to take reasonable steps to correct the situation once it learned or should have learned of the situation. *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1253–58 (6th Cir.1985); *Snell v. Suffolk County,* 782 F.2d 1094, 1102–05 (2d Cir.1986); *Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 924–25 (5th Cir.1982).

Kincade was the foreman in the warehouse and shipping department from December of 1975 until his termination in May of 1977. During this period, the testimony revealed, and the Court finds, that he was periodically harassed because of his race, both by his immediate supervisor, Darryl Teague, and by his subordinates. Teague was known by management at the time Kincade was assigned to the warehouse to be a cold, insensitive man, and they could not have been surprised when continuous conflict arose between them. The testimony also revealed that Kincade's subordinates were disrespectful of him and made racially derogatory statements about him, and that Teague routinely sided with the subordinates. The above plainly indicates that plaintiff has made out a prima facie case.

Defendant responds that Teague was gruff to everyone and that it took reasonable steps to correct conflicts as they arose. Assuming that these consti- tute a legitimate business justification, the Court nonetheless must conclude that they are pretextual. The record indicates that Kincade was singled out for excessive and pervasive harassment by Teague and by Kincade's subordinates. It further shows that management was repeatedly informed of the situation, yet its response was limited primarily to telling Teague and Kincade that they would have to learn to work together or both would be terminated. This is hardly a reasonable response.

In sum, the Court finds that plaintiff was the victim of intentional, excessive, and pervasive harassment on the basis of his race and that Firestone failed to take reasonable steps to correct the situation.

#### (iv) *Discriminatory Termination*

To establish a prima facie case of discriminatory termination, Kincade must show: (1) that he belongs to a protected class; (2) that he was satisfactorily performing his job; and (3) that despite this he was terminated. *Mills v. Ford Motor Co.,* 800 F.2d 635, 638–39 (6th Cir.1986); *Duchon v. Cajon Co.,* 791 F.2d 43, 46 (6th Cir.1986).

The testimony revealed that despite the conflict in the warehouse, Kincade satisfactorily performed his job. Inasmuch as the other elements are plainly satisfied, the Court concludes that he has made out a prima facie case.

Defendant asserts that its termination of Kincade was warranted because he disobeyed an order of the plant manager and refused to discuss his actions with the personnel manager. The Court finds that this assertion was supported by the testimony and that it constitutes a legitimate business justification.

Kincade argues that this justification is pretextual, but the Court cannot agree. Although the termination took place against a backdrop of discrimination in the warehouse, this cannot be relied upon by plaintiff to justify his disregard of directives of the plant manager or his refusal to justify his actions to his other superiors. In brief, the Court finds that plaintiff's termination was not an intention-

al device to discriminate against him. In addition, it finds no causal connection between his filing an EEOC complaint and defendant's termination decision. *Jackson*, 743 F.2d at 375.

In sum, the Court ENTERS JUDGEMENT for Kincade as to his claim that the work environment in the warehouse and shipping department was racially hostile, and it ENTERS JUDGMENT for defendant as to his other claims.

### 2. *James O'Dell Hunter*

#### a. *Findings of Fact*

Plaintiff James O'Dell Hunter is a black man who initially applied for employment with defendant on March 13, 1973, for a production position. He was interviewed shortly thereafter, but he received a letter dated March 19, 1973, from defendant that stated the company was "not in a position to offer [him] employment at [that] time." (Ex. P–40). It continued, "We are sorry we cannot be more encouraging; however, if there should be suitable employment opportunities in the near future, we will be happy to contact you." Hunter then contacted Kincade regarding his application to Firestone. Kincade intervened on Hunter's behalf with Thomas Bragg, the personnel manager at that time. Hunter was hired the following day. A period of approximately two weeks had elapsed since Hunter's interview. Bragg testified that the interview panel had recommended that Hunter be offered the next available position in stock preparation that was consistent with his previous experience as a machine operator. Firestone contends that Hunter would have been hired regardless of Kincade's intervention. Hunter alleges that defendant's failure to hire him after his initial interview constituted racial discrimination.

Once hired, Hunter rotated or "floated" through various jobs awaiting a specific assignment. He contends that he had to protest to his superior, John Smith, regarding the training of a less senior white production operator, Danny Fortner, before being assigned to a senior production operator's job building stabilizer plies and oper-

ating the bead winder machine. Hunter also asserts that Hayes Fann, a white employee hired at the same time as he, was promoted more rapidly than he to a supervisory position. The evidence, however, indicates that seniority had little bearing on the selection of employees for supervisory positions. Hunter introduced no evidence that he had applied for a supervisory position or that he completed the pre-supervisory training program that was a prerequisite to promotion to supervisor. Hunter did bid for a job as a trucker in IPI, and he offered evidence that two white employees were granted transfers to this department in his stead. Both of these men, however, submitted their bids before he did. Further, when Hunter inquired of Mr. Costanza of the personnel department why his transfer had not been approved, he was told that his department manager would not "release him." Bragg testified that under the system then in effect, only two transfers were permitted from a given department in a thirty day period without the permission of the department manager. In addition, Bragg testified that bids were taken in the order in which they were received.

Hunter also contends that he was advised to withdraw his bid for a transfer because subsequent openings in IPI would be in lower pay grades. Testimony was offered that an employee with an existing bid for a transfer to a given department was required to accept the next opening in that department. Hunter admitted that he did not want to accept a lower job or any transfer that would have resulted in a reduction in pay. Bragg testified that indeed the next openings were production operator positions rather than senior production operator jobs so that Hunter would have received a reduction in pay. He further testified that in advising Hunter of the possible consequences of transferring, he at no time attempted to prevent Hunter from transferring to another job.

Sometime prior to May of 1975, Hunter applied for a transfer to the laboratory. He testified that the interviewer, Mary Bryant, discouraged him from taking the

job pursuant to instructions from Bragg that she tell him "all of the bad aspects of this job." Bryant testified that there was nothing unusual about her interview with Hunter because a large number of applicants ordinarily were interviewed for each position that became available and that each applicant was given a description of the job for which he or she was bidding. In Hunter's case, this included information that he would receive a reduction in pay should he be transferred. Bryant denied providing Hunter with this information pursuant to a specific request by Bragg. Hunter received a transfer to the laboratory subsequent to the filing of the instant action and was still working in that position at the time of his testimony.

In addition to the allegations discussed above, Hunter claims that he was subjected to racially discriminatory acts in the terms and conditions of his employment throughout the course of his employment. He testified that while working in the stock preparation department, David Wimmer, his department manager, wrongly accused him of falsifying production records. Wimmer wanted to fire Hunter because he believed that Hunter's claim of regularly reaching 100% of his production quota for each day was untrue. Bragg testified that he spoke with Hunter regarding the allegations and that Hunter denied falsifying any records. Bragg testified that he then advised Wimmer to take no further action since he had no proof to support his suspicions.

Hunter also asserts that Wimmer was unfair in evaluating his performance and that he should have received "excellent" ratings because he met his production quotas every day and white employees whose performance was equal to his received such ratings. Hunter's testimony, however, contradicted his deposition of September of 1975 wherein he stated that he did not know of any white employees who had received higher ratings from Wimmer. Moreover, Hunter's complaint regarding his job evaluations is based on his subjective evaluation of his own performance. However excellent his work, he has presented no evidence, untainted by contra-

diction, that other employees received higher ratings. Hunter complains that these unfair ratings also were responsible for his failure to receive an early pay raise while working in production and in the laboratory. This assertion, however, is unsubstantiated because he has failed to demonstrate that he was the recipient of inequitable job evaluations. With respect to his pay raise while working in the laboratory, testimony indicated that employees were not eligible for early pay raises until they had worked in a particular department for a full year. The pay raise about which Hunter complains came within his first year in the laboratory.

Finally, Hunter claims that he was kicked by a white female employee. Mr. Miles, the plant manager, and Robert Walsh, Hunter's department manager at the time, both testified that Hunter had reported to them that the incident was an accident.

### b. *Conclusions of Law*

Plaintiff Hunter alleges that he was a victim of discrimination in the following areas: hiring, promotion decisions, and work environment. The Court considers each of these separately.

#### (i) *Discriminatory Hiring*

To establish a prima facie case of discrimination in hiring, Hunter must show: (1) that he is a member of a protected group; (2) that he applied for and was qualified for a job for which defendant was seeking applicants; (3) that he was denied employment; and (4) that after his rejection the position remained open and defendant continued to seek applications from persons with qualifications similar to his. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The testimony revealed that Hunter was hired just two weeks after his interview. Under these circumstances, the Court must conclude that Hunter has failed to make out a prima facie case because he was not denied employment.

#### (ii) *Failure to Promote*

As noted above, to establish a prima facie case for a claim of discriminatory fail-

ure to promote, Hunter must show: (1) that he belongs to a protected group; (2) that he applied for and was qualified for the position sought; (3) that he was considered for and denied the position; and (4) that he was rejected in favor of other employees with similar qualifications who are not members of his protected group. Hunter alleges four separate instances in which he was denied a promotion.

■ First, he contends that he was denied a timely promotion to a position as senior production operator. The proof at trial, however, consisted solely of Hunter's contention that he was not promoted until he complained to his supervisor. He did not provide any information that would enable the Court to conclude that a senior production operator's job was available or that he was qualified for such a position. Under these circumstances, the Court must conclude that he has failed to make out a prima facie case as to this claim.

Second, he contends that he was denied promotional opportunities that were available to another white employee named Hayes Fann. The testimony revealed that Fann was promoted to a supervisory position, and Hunter introduced no proof that he had sought the position granted to Fann or that he was qualified for this position. The Court must conclude that Hunter also has failed to make out a prima facie case with respect to this claim.

■ Third, he contends that he was denied a transfer to IPI as a trucker. The proof at trial showed that Hunter made out a prima facie case as to this claim. He was qualified for the two available trucking positions, he was denied the position, and other white employees were given the positions rather than he. The testimony further revealed, however, that both of these individuals submitted their bids before he did. In addition, the company had a policy that barred more than two transfers from a department at any particular time, and this prevented him from transferring after the other two had done so. This explanation, the Court finds, constitutes a legitimate justification for defendant's failure to grant Hunter a transfer. Turning to the question of whether this justification was pretextual, the Court finds that Hunter has failed to carry his burden of proof in this regard.

■ Fourth, he asserts that he was denied a transfer to the laboratory in the middle of 1974. Hunter also made out a prima facie case as to this claim. The testimony revealed that he was qualified for the position, that he was denied the position, and that other white employees were given the position. The proof, however, further revealed that when Hunter interviewed for the position, he told Ms. Bryant in the personnel department that he could not accept a reduction in pay and that he was denied the lab position because it was a lower paying position. The Court finds that this statement by Hunter provided a legitimate justification for denying him a transfer. It further finds that Hunter has failed to show that this justification was pretextual.

In sum, the Court finds that Hunter was not discriminatorily denied promotional opportunities. In addition, it finds no causal connection between his filing an EEOC complaint and defendant's promotion decisions. *Jackson*, 743 F.2d at 375.

(iii) *Racially Hostile Work Environment*

■ As noted earlier, to establish a prima facie case for harassment in the work environment, Hunter must show: (1) that he belongs to a protected racial group; (2) that he was subjected to excessive and pervasive harassment on the basis of his race; and (3) that Firestone failed to take reasonable steps to correct the situation once it learned or should have learned of the situation. Plaintiff alleges a number of specific instances of alleged racial discrimination in support of his claim that he was subjected to a racially hostile work environment. Inasmuch as these claims also constitute separate instances of alleged discrimination, the Court makes specific conclusions of law with respect to each and, at the end, also makes conclusions of law with respect to his claim that the work environment as a whole was racially hostile.

First, Hunter contends that he was wrongly accused of falsifying records by David Wimmer, his department manager. Immediately after Wimmer made the allegation that Hunter had misstated his production figures, Hunter informed Bragg of the allegation. Mr. Bragg, in turn, spoke with Wimmer about the allegation and instructed him to take no further action on his suspicions. Under these circumstances, the Court must conclude that Hunter has failed to create an inference that the allegation was racially motivated.

Second, he asserts that Wimmer unfairly evaluated his performance and failed to give him a pay raise. This allegation, however, was unsupported by proof. Indeed, Hunter gave contradictory testimony with respect to other employees who he alleged received higher ratings. The Court finds that Hunter has failed to create an inference that Wimmer's actions were racially motivated.

Third, he contends that he was kicked by a white employee. The proof, however, revealed that Hunter told the plant manager and his department manager that the incident was an accident. Under these circumstances, the Court must conclude that Hunter has failed to create an inference that the incident was racially motivated.

Based on the foregoing, the Court must reject Hunter's claim that he was subjected to a racially hostile work environment because he has failed to show that he was subjected to excessive and pervasive harassment on the basis of his race.

In sum, the Court ENTERS JUDGMENT for defendant as to Hunter's claims of disparate treatment.

### 3. *Thelma M. McHenry*

#### a. *Findings of Fact*

Plaintiff Thelma M. McHenry is a black woman who initially applied for employment with defendant in November of 1973 through the Murfreesboro office of the Tennessee Department of Employment Security. She was interviewed in January of 1974, at which time she was given an English test and a math test. On her application she stated that she was qualified for "clerical work since most of the work that I have done has been in an office but I can also work in a plant. I need a job very badly to pay my bills...." (Ex. P–44). During her interview, McHenry reiterated that she wanted to be considered for both positions and that she would probably prefer whichever job would pay the most money. She was offered a position and began her employment on January 11, 1974, as a production operator in the waste control department.

McHenry initially was responsible for operating a fork lift to collect waste and scrap. After working full time in the waste control department for approximately three weeks, McHenry began training in the control room for a few hours each day for about thirty days. When she was assigned to the control room, she was advised that the assignment would be temporary and that other employees also would be trained, but that she would be considered for a permanent assignment to that position in the future. After thirty days, she was returned to her previous position. Because she was not give a full time position in the control room, McHenry spoke about this to Bobby Lee Kincade and William Vaughn, the state chairman of the NAACP, and she filed a charge of discrimination with the EEOC. Firestone gave her a permanent position in the control room in March of 1974.

McHenry applied for but was denied a position as lab assistant in October of 1974, in January of 1975, and in February of 1975. In March of 1975, she applied for but was denied a position as junior scheduler in shipping. In August of 1975, she applied for and received a position as panel clerk in the IPI department. Mary Bryant, a personnel representative, testified that McHenry was not selected for these positions because they offered less pay and because McHenry said she preferred to remain in her current position.

McHenry testified that in September of 1976, she registered a complaint of racial discrimination with Mr. Costanza in the personnel department because she had

been instructed to take physical inventory of in-process materials. Although McHenry contended that a white employee previously assigned to the same position, Shirley Price, had not been required to take physical inventories, on cross-examination McHenry admitted that Price had taken physical inventories but contended that Price did not have to take those inventories on a daily basis. The job description for the position of control panel clerk that McHenry held at that time clearly states that the clerk is required to take "physical inventories of components in storage areas by code and location to update the locater file and insure its accuracy." (Ex. D-124). McHenry admitted that when the job duties were initially explained to her that it was clear that she would have to update the locater file and that she understood that taking physical inventory was part of that task. Costanza investigated her complaint and found no basis for it.

In July of 1977, McHenry's employment with Firestone was terminated because she had falsified records. She had been warned about excessive absenteeism on four different occasions prior to her termination: in January of 1976, May of 1976, September of 1976, and May of 1977. She also had been advised by her department manager, Joseph Henn, that because of her record of absenteeism, any further absences would be checked closely by the company. (McHenry Tr. at 714). On July 15, McHenry contacted her supervisor, Les Sanders, and advised him that she was taking some time off in order to take her daughter for an appointment with Dr. Eugene Odom in Murfreesboro, Tennessee. (*Id.*) Dr. Odom's office was contacted by Ms. Bryant of the personnel department at Henn's request, and was advised that neither McHenry nor her daughter had been seen on July 15 as McHenry had informed the company. (Ex. D-337). The doctor's office further advised Bryant that McHenry had contacted them on July 19 and asked that they advise her supervisor, if he called, that she had been seen in their office on July 15. McHenry admitted that she had not taken her daughter to the doctor and that she had requested that the doctor's office make a false statement to the company regarding her excuse. (Ex. D-338).

When McHenry was confronted with the facts by Bryant and Henn, she admitted that she had not taken her daughter to the doctor, but contended that she had had personal business to take care of and had actually gone to a public health clinic in Nashville under a false name. Based on these facts and her own admission, McHenry was terminated on July 21, 1977 for falsifying records and giving a false excuse for her absence. She filed a request for review of her termination by the plant manager through the company's appeals procedure in which she stated that she understood that the reasons she had given for taking off work "was reason for termination...." (Ex. D-127). McHenry's termination was reviewed by the company's review board comprised of several fellow employees including Carolyn Sneed, a cousin of McHenry. Her termination was sustained by the review board.

### b. *Conclusions of Law*

Plaintiff McHenry alleges that she was the victim of discrimination in the following areas: promotions, conditions of employment, and termination. The Court considers each of these separately.

#### (i) *Failure to Promote*

As noted above, to establish a prima facie case of discrimination in promotions, McHenry must show: (1) that she belongs to a protected group; (2) that she applied for and was qualified for the position sought; (3) that she was considered for and denied the position; and (4) that she was rejected in favor of other employees with similar qualifications who are not members of his protected group. McHenry alleges she has been denied three promotional opportunities.

█ First, she contends that she was denied a position in the control room as a computer operator. The testimony revealed that McHenry was hired as a production operator in waste control, but after a few weeks began training as a computer

operator on a part-time basis. After training for a month, she was returned to her previous position on a full time basis. Defendant subsequently reassigned her to the control room after she filed an EEOC complaint. The Court finds that McHenry has made out a prima facie case that the defendant's initial failure to give her a full time position in the control room was discriminatory.

Defendant responds that the control room was just being installed at that time and McHenry was trained along with a number of other employees to fill permanent positions that would become available in the future. When decisions as to permanent assignments were made, McHenry was selected notwithstanding her filing of an EEOC complaint. The Court finds that defendant's failure to give McHenry a permanent assignment at an earlier date was founded on a legitimate justification. Further, the Court finds that McHenry has failed to carry her burden of showing that this justification was pretextual.

■ Second, she asserts that she applied for but was denied a position as a lab assistant and as a junior scheduler. The Court must conclude that McHenry has failed to make out a prima facie case as to these claims because she admitted on cross-examination that she was offered these positions but chose to remain in her current position because the pay was better.

### (ii) Conditions of Employment

■ To establish a prima facie case of discrimination in the conditions of employment, McHenry must establish: (1) that she belongs to a protected racial group; (2) that specific conditions of employment were imposed upon her; and (3) that the circumstances surrounding the conditions give rise to an inference of discrimination. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The testimony at trial revealed that McHenry was required to inventory components in storage areas on a daily basis, rather than less frequently as she contends white employees had been required to do. The Court finds no basis in the proof to support an inference that this requirement was imposed upon her because of her race.

### (iii) Discriminatory Termination

■ As noted above, to establish a prima facie case of discriminatory termination, McHenry must show: (1) that she belongs to a protected class; (2) that she was satisfactorily performing her job; and (3) that despite this she was terminated. McHenry alleges that her termination was racially motivated. The proof revealed that she had been warned repeatedly about her excessive absenteeism and that future absences would be monitored closely. Prior to her termination, however, there is no allegation that she was not satisfactorily performing her job. As a result, the Court finds that she has made out a prima facie case that her termination was racially motivated.

Defendant responds that on July 15, 1977, McHenry falsely reported that she was taking her child to see a doctor as a basis for obtaining a leave. In addition, she admitted that she called the doctor by whom she was supposed to have been seen and asked him to make a false statement about her absence. The Court finds that these circumstances plainly constitute a legitimate justification for her termination. It further finds that McHenry has failed to carry her burden of showing that this justification was pretextual. In addition, it finds no causal connection between her filing an EEOC complaint and defendant's termination decision. Jackson, 743 F.2d at 375.

In sum, the Court ENTERS JUDGMENT for defendant as to McHenry's disparate treatment claims.

### 4. Mary Pope Fite

#### a. Findings of Fact

Plaintiff Mary Pope Fite is a black woman who initially applied for employment with Firestone in February of 1974. (Ex. P–33). She indicated that she was interested in a position as a PBX operator in any production area. She was interviewed but

not hired. (Ex. P–35). Fite acknowledged on cross-examination that she was told that Firestone had no openings for a PBX operator and that production employees were not being hired because of a "machinery hold-up or something." (Fite Tr. at 471). After her rejection, she filed a charge of discrimination with the EEOC. Thereafter, in May of 1974, Fite filed another application with Firestone and was hired to work in the stock preparation department. She was assigned to operate a bead wrap machine and to pick up waste material.

Fite asserts that she was discriminated against by Gerald Boyce, her supervisor. She testified: "Mr. Boyce ... was prejudiced.... [H]e showed no interest in me and assigned me to a machine which I was not familiar with and told me to do the job." (Fite Tr. at 456). More specifically, she asserts that she was not instructed in the operation of the bead wrap machine, that the machine became jammed, and that it tilted over on her and tore her pants off. (Fite Tr. at 459). Boyce reportedly reacted only by asking her whether she had another pair of pants. Bragg testified that he received numerous complaints regarding Boyce's treatment from both black and white employees and that he was aware of Boyce's abruptness, but that he found no evidence of racial motivation in his treatment of any employee. Fite testified that she never heard Boyce use any racially discriminatory language. (Fite Tr. at 459).

From the time she was hired in May of 1974 through June of 1980, the date she testified, Fite applied for but was denied transfers to a number of positions, including positions in the laboratory, in the statistical quality control department, as a classifier, and as a wire winder. In 1976, she was accepted for and completed a pre-supervisory training course offered by Firestone, but since that time has not been offered a supervisory position. Ms. Bryant testified that Fite *may* have been denied transfers because of attendance problems, but no substantiating evidence was provided. In this regard, her alleged absenteeism problem did not disqualify her from participating in the pre-supervisory training program, admittance to which was preceded by an in-depth evaluation of her work history.

### b. *Conclusions of Law*

Plaintiff Fite alleges that she was the victim of discrimination in the following areas: hiring, failure to train, and promotion decisions. The Court considers each of these separately.

#### (i) *Discriminatory Hiring*

As noted earlier, to establish a prima facie case of discrimination in hiring, Fite must show: (1) that she is a member of a protected group; (2) that she applied for and was qualified for a job for which defendant was seeking applicants; (3) that she was denied employment; and (4) that after her rejection the position remained open and defendant continued to seek applications from persons with similar qualifications. Fite alleges that Firestone's failure to hire her at the time she first applied was racially motivated. The proof showed that when she first applied she was informed they were hiring no one because there had been a "machinery hold-up or something." Under these circumstances, the Court must conclude that Fite has failed to make out a prima facie case.

#### (ii) *Failure to Train*

To establish a prima facie case of discrimination in training, Fite must show: (1) that she belongs to a protected class; and (2) that she was denied training accorded to similarly situated white employees. *Long v. Ford Motor Co.*, 496 F.2d 500, 505 (6th Cir.1974). Fite asserts that she was assigned to a bead wrap machine, was not instructed in how to operate the machine, and was injured when the machine fell on top of her. The proof revealed that she was given little if any training on this machine. It did not indicate, however, that similarly situated white employees received more adequate training. Accordingly, the Court must conclude that she has failed to make out a prima facie case.

#### (iii) *Failure to Promote*

As noted above, to establish a prima facie case for a claim of discriminatory

failure to promote, Fite must show: (1) that she belongs to a protected group; (2) that she applied for and was qualified for the position sought; (3) that she was considered for and denied the position; and (4) that she was rejected in favor of other employees with similar qualifications who are not members of her protected group. Plaintiff alleges that she was denied a number of promotional opportunities because of her race. The proof revealed that she received no promotions from the date she was hired in May of 1974 through the date of her testimony in June of 1980. During this time, she applied for a number of promotions.

First, she applied for a position for which she was qualified in the laboratory. Fite testified that a number of other persons, many of whom were white, were given lab positions in her stead. The Court finds that she has made out a prima facie case. Further, inasmuch as defendant offered no proof as to a legitimate justification for its actions, the Court finds that she was the victim of disparate treatment.

Second and third, she applied for but was denied a position in statistical quality control and as a classifier. The proof, however, did not indicate whether Fite was qualified for these positions or that she was rejected in favor of other white employees with similar qualifications. Accordingly, the Court must conclude that the elements for a prima facie case have not been shown as to these promotions.

Fourth, she applied for but did not receive a position as a wire winder in October of 1974. The testimony did not indicate who received this position, but it did indicate that she applied for the position less than six months after beginning work at Firestone. Under the seniority system in effect at the plant, no promotion could be granted until an employee had been at the plant for six months. Under these circumstances, the Court must conclude that Fite was not qualified for the position sought and, therefore, has failed to make out a prima facie case.

Fifth, she was not given a supervisory position after completing the pre-supervisory training program offered by Firestone in 1976. Fite identified only one supervisory position for which she claims she was qualified and that she was denied in favor of a white employee. She testified on cross-examination that she was denied a supervisory position in stock preparation that was granted to a white employee, Mark Fox, who was hired after her and was less qualified than her. The Court finds that plaintiff has made out a prima facie case. Further, inasmuch as defendant offered no proof as to a legitimate justification for its actions, the Court must conclude that Fite was discriminatorily denied this promotion because of her race.

In sum, the Court ENTERS JUDGMENT for Fite as to her claim of discriminatory failure to promote and ENTERS JUDGMENT for defendant as to her other claims.

### 5. Sharon McHenry

#### a. Findings of Fact

Plaintiff Sharon McHenry is a black woman who applied for employment with Firestone in November of 1973 through the Murfreesboro office of the Tennessee Department of Employment Security. She was hired and began work in January of 1974. She was first placed on a tape winding machine, and after a period of time she bid for and was granted a position on a tread ply machine.

During this time, McHenry asserts, she was harassed by Gerald Boyce, her supervisor. The only incident about which she complains is one occasion in which she was warned by Boyce regarding conversations with other employees during working hours. According to McHenry's own testimony, within a few minutes after receiving a warning from Boyce for such activity, she began to engage another employee in a conversation and received another warning from Boyce. (McHenry Tr. at 776–778). McHenry admitted that Boyce had never made any "racial" statements to her, but contended that Boyce reflected a discriminatory attitude toward her because of a "roughness in his voice and, you know,

kind of argumentative with me." (McHenry Tr. at 766).

On September 20, 1974, McHenry reported late for work and when asked the reason for her tardiness stated that the reason was "of a personal nature and that she did not want to discuss it." (Ex. D–123). McHenry was interviewed by her supervisor Gerald Boyce, her department foreman, Mike Harrington, and Mr. Costanza of the personnel department. During the interview, her attendance record was reviewed. Since her initial date of employment of January 4, 1974, McHenry had had 15 different periods or incidents of absence and/or tardiness totaling 19 days. In fact, she had received two disciplinary warnings for her poor attendance, one in April of 1974, and the other in August of 1974. The second warning specifically stated:

> Any further absenteeism and/or tardiness except for extremely compelling circumstances will lead to dismissal until such time as her attendance and tardiness can be considered satisfactory.

(Ex. D–375). Because of her poor attendance record, McHenry was terminated for unsatisfactory service. She filed a charge of discrimination with the EEOC on October 12, 1974. To demonstrate that her termination was discriminatory, McHenry attempted to compare her own attendance record to that of Linda Davenport, a white employee in the stock preparation department. McHenry contended that Boyce was much friendlier toward Davenport and that Davenport was not terminated even though she had a record of absenteeism worse than McHenry's. Defendant's employment records reflect that Davenport received disciplinary warnings for attendance and tardiness problems and was terminated on December 5, 1984. (Ex. D–410).

#### b. *Conclusions of Law*

Plaintiff McHenry alleges that she was the victim of discrimination in the following areas: conditions of employment and termination. The Court considers each of these separately.

##### (i) *Conditions of Employment*

██ As noted earlier, to establish a prima facie case of discrimination in the conditions of employment, McHenry must establish: (1) that she belongs to a protected class; (2) that specific conditions of employment were imposed upon her; and (3) that the circumstances surrounding the conditions give rise to an inference of discrimination. McHenry asserts that she was discriminatorily warned about having conversations with other employees because of her race. The Court finds that the proof does not give rise to an inference that the warning in question was discriminatorily issued.

##### (ii) *Discriminatory Termination*

██ As stated above, to establish a prima facie case of discriminatory termination, McHenry must show: (1) that she belongs to a protected class; (2) that she was satisfactorily performing her job; and (3) that despite this she was terminated. McHenry was terminated on September 20, 1974. The proof indicated that prior to the events of that date, she was satisfactorily performing her duties. Accordingly, the Court finds that plaintiff has made out a prima facie case.

Defendant responds that McHenry was terminated because of her absenteeism. The testimony revealed that she had received two warnings for absenteeism prior to September 20, and that she was tardy for work on that date. The Court finds that these facts constitute a legitimate justification for her termination. Further, it finds that plaintiff has failed to demonstrate that this justification was pretextual.

In sum, the Court ENTERS JUDGMENT for defendant as to McHenry's disparate treatment claims.

#### 6. *Emily D. Henry*

##### a. *Findings of Fact*

Plaintiff Emily D. Henry is a black woman who sought employment with Firestone on three separate occasions: she submitted two applications in July of 1972 and one in October of 1974. She was not hired. Hen-

ry first filed two applications for a secretarial position at the Murfreesboro office of the Tennessee Department of Employment Security. She listed on her applications that she had a college degree in office administration. She was given a manual dexterity test and a written test composed of English and math components. Her secretarial skills were not tested. When no offer of employment resulted, she filed a charge of discrimination against Firestone with the EEOC in March of 1974.

In October of 1974, Henry was contacted by Ms. Bryant in Firestone's personnel office to determine whether she was interested in a secretarial position. Bryant testified that she called Henry to schedule an interview with her after being given her name by Thelma McHenry. (Bryant Tr. at 388). Bryant testified that when she contacted Henry to determine if she was interested in a position, Henry responded that she would have to "get back" with her since she indicated that she had had an application on file for some time. Bryant testified that when Henry called her back, she stated that she had gotten in touch with the president of the NAACP chapter in Murfreesboro and concluded "that the interview itself sounded sorta fishy," but she agreed to come in and interview for the position.

Bryant testified that the openings for which Henry was interviewed were secretarial positions in the methods and standards department and the technical service department. During the interview, Henry told Bryant of the pending discrimination charge. Bryant in turn conveyed this information to Bragg, the director of personnel. Both of the above positions were awarded to persons who had worked at Firestone on a temporary basis through a temporary help agency. Bryant testified that Jackie Boyle, a black woman who had been working as a temporary employee in the technical service department, was employed full time for the secretarial opening in that area. Teresa Duke, a white woman, was employed in the methods and standards position. Duke did not have a college degree, but she had several years of

secretarial experience and had worked at the plant for approximately two months.

b. *Conclusions of Law*

Plaintiff Henry alleges only that she was the victim of discriminatory hiring. As noted earlier, to establish a prima facie case of discrimination in hiring, Henry must show: (1) that she is a member of a protected group; (2) that she applied for and was qualified for a job for which defendant was seeking applicants; (3) that she was denied employment; and (4) that after her rejection the position remained open and defendant continued to seek applications from persons with similar qualifications.

■ First, she claims that defendant's failure to interview or to hire her after she submitted her first two applications was discriminatory. The testimony revealed that plaintiff submitted these applications, that she was denied employment, and that defendant continued to seek applicants throughout this time. The Court concludes that plaintiff has made out a prima facie case.

Defendant introduced testimony that it had received several thousand applications for a limited number of positions during this time and that Henry's application was not referred to it by the Employment Security Office of the State of Tennessee. Under these circumstances, the Court finds that defendant's justification is legally legitimate. Turning to the question of whether this justification is pretextual, the Court finds that Henry has failed to carry her burden of proof in this regard. There is no evidence that Henry was singled out or that defendant instructed the Employment Security Office as to the number of black applicants to refer. Its failure to interview each applicant cannot be regarded as discriminatory.

■ Second, she claims that defendant's failure to hire her after it interviewed her in October of 1974 was discriminatory. The proof revealed that Henry was qualified for the position she was seeking and that a white employee was assigned the position instead of her. The Court finds

that plaintiff has made out a prima facie case.

Defendant responds that the white employee, Teresa Duke, who was hired was at least as well qualified as Henry. The testimony revealed that Duke had several years of secretarial experience. Under these circumstances, the Court must conclude that defendant had a legitimate justification for not hiring Henry. It further finds that plaintiff has failed to carry her burden of showing that this justification is pretextual. In addition, it finds no causal connection between her filing an EEOC complaint and defendant's hiring decision. *Jackson*, 743 F.2d at 375.

In sum, the Court ENTERS JUDGMENT for defendant as to Henry's disparate treatment claims.

### 7. *Bobby W. Ivy*

#### a. *Findings of Fact*

Plaintiff Bobby W. Ivy is a black man who filed several applications for employment with Firestone. He first applied in August of 1972 for "any position that might be available." (Ex. P–26). He was not interviewed. Although Ivy testified that he had four years of key punch experience in the Air Force and that he was enrolled in a data processing course at the Nashville Technical Institute, he expressed no special interest in this area. He next applied for a position in Firestone's data processing department for which he was interviewed in 1973. (Ex. P–27). By letter dated October 9, 1973, he was advised that he had not been hired for the position for which he was applying. (Ex. P–28). He reapplied again in 1974 seeking a position as computer operator trainee. He was interviewed again, but was told by a representative at Firestone to come back and apply again after completing the training program in which he was enrolled at the Nashville Technical Institute. In March of 1974, Ivy filed a charge of discrimination with the EEOC alleging that he had not been hired because of his race. (Ex. P–63). He applied again in 1975, but was not interviewed.

At the time of his first application, Ivy had three and a half years of data processing experience in the military, but no industrial experience in this area. He gained no such experience during the period from 1972 to 1975 while he was enrolled at the Nashville Technical Institute. Ivy was not aware of the identity of any person who was hired for any of the positions for which he sought employment. Ms. Bryant, a Firestone personnel representative, testified that she was on the panel that interviewed Ivy in 1974. She stated that two women were selected over Ivy. On of these women, Barbara Jean Lowery, had a number of years of keypunch experience at the time of her employment. (Ex. D–13). The qualifications of the other woman, Jean Price, were not introduced.

#### b. *Conclusions of Law*

Plaintiff Ivy alleges only that he was the victim of discriminatory hiring, the requirements for a prima facie case of which were outlined above. The Court now examines each of Mr. Ivy's claims separately.

First, he claims that he was discriminatorily denied employment when he applied in 1972. He was not interviewed. The Court, based on its earlier finding that defendant received several thousand applications during this period, must reject this claim. Like Ms. Henry, the proof does not indicate that Ivy was singled out on the basis of his race.

██ Second, he contends that he was discriminatorily denied employment when he applied in 1973. Ivy testified that he was interviewed, but was denied employment by letter sent on October 9, 1973. The Court must conclude that plaintiff has failed to make out a prima facie case as to this claim. No proof was introduced that a position was available at that time or that after his rejection a position remained open and defendant continued to seek applications from persons with similar qualifications.

██ Third, he contends he was denied employment when he applied in 1974. The proof revealed that Firestone had two keypunch positions open at the time, that it

denied plaintiff employment despite his qualifications for these positions, and that two white employees were hired instead. The Court finds that Ivy has made out a prima facie case as to this claim.

Defendant asserts as a legitimate justification that the white employees hired for the positions were as qualified as Ivy. The testimony of Ms. Bryant from personnel, however, provided no information as to the background of one of these employees, Jean Price. As a result, the Court finds that defendant has failed to carry its burden of demonstrating a legitimate justification for its failure to hire Ivy and, therefore, it must conclude that he was the victim of intentional discrimination.

Fourth, he asserts that he was denied employment when he applied in 1975. The Court finds that plaintiff has failed to make out a prima facie case as to this claim because he has failed to show that positions were available and that he was qualified for the positions. Plaintiff's testimony that he was interviewed is not sufficient to demonstrate these facts.

In sum, the Court ENTERS JUDGMENT for Ivy for defendant's discriminatory failure to hire him.

### 8. *Alice Gail Cook*

#### a. *Findings of Fact.*

Plaintiff Alice Gail Cook is a black woman who applied for a position as a clerk-typist in July of 1975. She testified that she called the plant to determine what types of positions were available and was told by Ms. Bryant in the personnel department that a clerk-typist position was open. (Cook Tr. at 564). Bryant also was on the panel that interviewed her for a position with the defendant. (Cook Tr. at 561). Following the interview, Cook was notified by Bryant that the company had no suitable position for her (Ex. P–40). It did not articulate any reason for this decision.

Cook listed her skills as typing at 60 words per minute and taking "light" dictation. As shown on her resume submitted with her employment application, she had held 12 different jobs over the 8 years immediately preceding her application, including some temporary positions. (Ex. P–89; Tr. 567–8). Bryant testified that Mary Cummings (Fitzgerald), a black female, was hired for the position for which Ms. Cook was interviewed.

#### b. *Conclusions of Law*

■ Plaintiff Cook alleges only that she was the victim of discriminatory hiring, the requirements for a prima facie case of which were outlined above. The proof showed that a clerk-typist position was open for which Cook was interviewed. It further revealed, however, that another black female, Mary Cummings, was hired for the position. Under these circumstances, the Court finds that plaintiff has failed to make out a prima facie case. ·

In sum, the Court ENTERS JUDGMENT for defendant as to Cook's claim of disparate treatment.

### 9. *Joseph Johnson*

#### a. *Findings of Fact*

Plaintiff Joseph Johnson is a black man who applied for employment in October of 1972 with Firestone for a position in the warehouse, in production, or doing office work. (Ex. P–31). He filed his application through the Murfreesboro branch of the Tennessee Department of Employment Security. He was interviewed in April of 1973 and was given a test that contained English and math components. He was not offered employment, and in March of 1974, he filed a charge of employment discrimination.

At the time of his application, Johnson was enrolled at Draughon's Business College of Nashville in a business administration course that provided instruction in filing, accounting, and general office work. He had prior work experience at Baird–Ward Printing Company as a janitor, and as a waiter, dishwasher and busboy. On cross-examination, Johnson admitted that during his interview he was told by the interviewer that the rotating shift schedule then in effect at Firestone might interfere with his classes. He had no knowledge as

to the identity of any person hired for any position for which he applied.

b. *Conclusions of Law*

 Plaintiff Johnson alleges only that he was the victim of discriminatory hiring, the requirements for a prima facie case of which were outlined above. The testimony revealed that plaintiff submitted an application and was interviewed. He failed, however, to show that any positions were available or that he was qualified for positions that may have been available. Under these circumstances, the Court concludes that plaintiff has failed to make out a prima facie case.

In sum, the Court ENTERS JUDGMENT for defendant as to Johnson's disparate treatment claims.

C. Summary of Conclusions of Law as to Individual Claims

In the foregoing discussion, the Court has considered whether the individual named plaintiffs were the victims of disparate treatment in the terms and conditions of employment at defendant's LaVergne plant. Having examined each individual's claims separately, it has found that three of the named plaintiffs were the victims of unlawful discrimination: Bobby Lee Kincade (racially hostile work environment); Mary Pope Fite (discriminatory failure to promote); and Bobby W. Ivy (discriminatory failure to hire). Accordingly, the Court hereby ENTERS JUDGMENT for these plaintiffs as to these claims. With respect to other claims made by these plaintiffs and by the other named plaintiffs in this action, the Court finds that defendant must prevail as to each of these claims. As a result, the Court hereby ENTERS JUDGMENT for defendant as to those claims.

III. SUMMARY

The named plaintiffs in this lawsuit are nine black persons who claim that in the mid–1970's, defendant Firestone Tire and Rubber Company discriminated against them because of their race in the terms and conditions of employment at its plant in LaVergne, Tennessee. Discrimination on the basis of race is prohibited by two federal statutes: 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Pursuant to these statutes, plaintiffs in this action seek monetary, injunctive, and declaratory relief on behalf of themselves and also on behalf of all other blacks who may have been discriminated against because of their race by defendant during this time period. This Memorandum details the Court's findings of fact and conclusions of law with respect to these claims.

In the first section of the Memorandum, the Court examines plaintiffs' claims of class discrimination. To prevail as to these claims, plaintiffs had the burden of proving by a preponderance of the evidence that defendant maintained a systemwide pattern or practice of intentional discrimination against black persons (the disparate treatment theory) or that it utilized facially neutral employment practices that had a significant discriminatory impact on black persons as a group (the disparate impact theory). The Court, having fully reviewed all testimony presented at trial and all statistical evidence submitted by the parties, finds that plaintiffs have not carried their burden of proof as to these claims. Accordingly, the Court ENTERS JUDGMENT for defendants as to these claims.

In the second section of the Memorandum, the Court examines claims of discrimination by the individual named plaintiffs in this action. To prevail as to these claims, each plaintiff had the burden of proving by a preponderance of the evidence that defendant intentionally discriminated against him or her in the terms and conditions of employment (the disparate treatment theory) at the LaVergne plant. The Court, having fully reviewed the testimony presented on behalf of each plaintiff, finds that three of the named plaintiffs were the victims of intentional discrimination: Bobby Lee Kincade (racially hostile work environment); Mary Pope Fite (discriminatory failure to promote); and Bobby W. Ivy (discriminatory failure to hire). Accordingly, the Court ENTERS JUDGMENT for these plaintiffs as to these claims of discrimination, and it ENTERS JUDGMENT

for defendant as to all other claims of the above three plaintiffs and all claims by other individual named plaintiffs.

An Order will be entered simultaneously with this Memorandum.

### ORDER

In accordance with the contemporaneously entered Memorandum, the Court hereby finds as follows:

(1) JUDGMENT is hereby ENTERED for defendant Firestone Tire and Rubber Company as to plaintiffs' claims of class discrimination.

(2) JUDGMENT is hereby ENTERED for plaintiff Bobby Lee Kincade for his claim that he was subjected to a racially hostile work environment.

(3) JUDGMENT is hereby ENTERED for plaintiff Mary Pope Fite for her claim that she was denied promotions because of her race.

(4) JUDGMENT is hereby ENTERED for plaintiff Bobby W. Ivy for his claim that he was denied employment because of his race.

(5) JUDGMENT is hereby ENTERED for defendant Firestone Tire and Rubber Company as to all other claims asserted by plaintiffs Bobby Lee Kincade, Mary Pope Fite, and Bobby W. Ivy.

(6) JUDGMENT is hereby ENTERED for defendant Firestone Tire and Rubber Company as to all claims by plaintiffs James O'Dell Hunter, Thelma McHenry, Sharon McHenry, Emily Henry, Alice Gail Cook, and Joseph Johnson.